1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK            ORIGINAL
 2   -------------------------------------x
     UNITED STATES OF AMERICA,
 3
                         Plaintiff,          Docket No.:
 4                                           08 CR 076 (NGG)

 5          versus

                                             U.S. Courthouse
 6   NICHOLAS CALVO,                         225 Cadman Plaza East
                                             Brooklyn, NY 11201
 6
                         Defendant.
 7   -------------------------------------x
                                             February 12, 2008
 8                                           10:00 a.m.

 9          Transcript of Criminal Cause for Bail Appeal

10   Before:   HONORABLE NICHOLAS G. GARAUFIS,
                                  District Court Judge
11
                              APPEARANCES
12
     For the Government:        BENTON J. CAMPBELL, ESQ.
13                              United States Attorney
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  ROGER BURLINGAME, ESQ.,
                                     Assistant U.S. Attorney
16
     For the Defendant:         BURKE, MIELE & GOLDEN, LLP
17                              100 Washington Avenue
                                Suffern, New York 10901
18                              BY:  PATRICK T. BURKE, ESQ.

19                              EMILY R. DANIEL, ESQ.
                                69 West 9th Street, Suite 6J
20                              New York, New York 10011

21   Court Reporter:            MICHELE NARDONE, CSR, RPR
                                Official Court Reporter
22                              225 Cadman Plaza East
                                Brooklyn, New York 11201
23                              Phone:  718-613-2601
                                Fax:  718-613-2631
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1      (In open court.)

2      (Defendant present.)

3      THE CLERK:  United States versus Calvo.

4      MS. DANIEL:  Good morning, your Honor.

5      MR. BURLINGAME:  Good morning, your Honor.

6      THE COURT:  Good morning.

7      MR. BURLINGAME:  Roger Burlingame for the United

8  States.

9      MR. BURKE:  Your Honor, my name is Patrick Burke, and

10  I have been asked to represent Mr. Calvo, in substitution for

11  Ms. Daniel, who has done a wonderful job up until now.  Since

12  Ms. Daniel has handled the bail application up until now, it

13  would really be beneficial to us all for her to be here.

14      THE COURT:  That's fine.  That's not a problem.

15      MR. BURKE:  Thank you, your Honor.

16      This is Emily Daniel, your Honor, for the record.

17      THE COURT:  Really?  You are Ms. Daniel?

18      MS. DANIEL:  Yes.

19      THE COURT:  Why don't you state your appearance,

20  Ms. Daniel.  I'm surprised that's you.

21      MS. DANIEL:  I haven't seen you in a while.

22      THE COURT:  I haven't seen Ms. Daniel in a while.

23      MS. DANIEL:  Emily Daniel for the defendant, your

24  Honor.

25      THE COURT:  You are Mr. Calvo?

Proceedings

1        THE DEFENDANT:  Yes.

2        THE COURT:  Good morning.

3        THE DEFENDANT:  Good morning.

4        THE COURT:  This is an appeal by the government?

5        MR. BURLINGAME:  Yes.

6        THE COURT:  First, let me tell you that I have read

7   the transcript before Judge Bloom.  So I have some sense of

8   what's at issue here.  I know the defendant is charged in ten

9   substantive counts but not in the racketeering conspiracy

10  count.

11       MR. BURLINGAME:  That's correct, Judge.

12       THE COURT:  Okay.  So we understand, and I know the

13  charges, I have read the indictment.

14       So we are ready to go?

15       MR. BURLINGAME:  That's correct.

16       THE COURT:  All right.

17       MR. BURLINGAME:  Judge, the government's position is

18  very simple.  We are not seeking detention, a permanent order

19  against the defendant.  We just want a bail package that we

20  feel reflects the seriousness of the charges against the

21  defendant and the risk of flight that he poses.

22       We feel that the package that Judge Bloom appropriated

23  yesterday, especially with sort of unnamed suretors, is

24  unreasonable.  Even if there were good suretors to appear, that

25  a $300,000 bond secured by $30,000 in cash for a man who makes

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

4

Proceedings

1   $100,000 a year and received personally $110,000 in extortion

2   payments over a two-year period is, you know, if he chose to

3   flee, which he is facing a couple of substantive counts which

4   carry 20-year maximum penalties, it's a matter of saying it's a

5   wash-out to the suretors to make them whole.

6          And I don't -- I feel like he should have a greater --

7   there could be more moral persuasion placed on him to make sure

8   that he is not going to flee.

9          THE COURT:  Okay.

10          MS. DANIEL:  May I respond, your Honor?

11          THE COURT:  Yes.

12          MS. DANIEL:  First, your Honor, this is an appeal by

13   the government, and I believe that this appeal, whether it was

14   to this court or to the Second Circuit, basically should be

15   addressed on an abuse of discretion standard, which is the

16   typical standard for appeal.  So whether or not this Court

17   finds Magistrate Bloom's decision absolutely perfect or might

18   disagree, the question is whether or not she abused her

19   discretion.  And I would say she clearly did not.

20          THE COURT:  You agree she abused the standard?

21          MR. BURLINGAME:  It's not -- it's de novo.  I have

22   just read a dozen cases about --

23          THE COURT:  A dozen?

24          MR. BURLINGAME:  -- all the detention hearings for the

25   Cirillo case, the Gotti case, the Salerno; are all appeals held

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings                        5

1  before the magistrate judge, and the district court reviews

2  under a de novo standard, and the Second Circuit reviews under

3  abuse of discretion.

4           THE COURT:  Who does, the Second Circuit?

5           MR. BURLINGAME:  Yes.

6           MS. DANIEL:  Your Honor, I think that's a technical

7  distinction whether the Second Circuit or this Court.  In my

8  opinion, the standard should be the abuse of discretion

9  standard.

10          In any case, I will get to the merits of bail

11 detention.  There is still a bond of $300,000.  These are

12 gainfully employed --

13          THE COURT:  This defendant does not own his own home?

14          MS. DANIEL:  Excuse me, your Honor?

15          THE COURT:  He doesn't own his own home?

16          MS. DANIEL:  He owns his own home, but he has no

17 equity in it.  It's actually in his wife's name, but she is

18 divorcing him.  I have spoken to her, and it is absolutely

19 clear she is not assisting him in any way, shape, or form, in

20 addition to which the house is in her name.  There is virtually

21 nothing that I can do.

22          THE COURT:  He has no savings account?

23          THE DEFENDANT:  No.

24          THE COURT:  And he has no equity of any kind of his

25 own accord?

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

6

1          MS. DANIEL:  I believe that the house even has -- has

2    next to no equity, but it's not in his name.

3          THE COURT:  No.  But I mean, does he have a savings

4    account?  Does he own shares of stock?

5          THE DEFENDANT:  No.

6          THE COURT:  He is the salesman for a construction

7    company?

8          MS. DANIEL:  Your Honor, I'm glad you mentioned that.

9    The name of the company is Nacirema.

10          In yesterday's paper and in my discussions, they have

11    been told by the Business Integrity Commission to cut their

12    ties with Mr. Calvo because of this indictment.  The government

13    was also questioning Mr. Calvo about Nacirema.  They, at this

14    point, could not even help if they wanted to.  It's a total

15    conflict of interest with him.

16          THE COURT:  Who has?

17          MS. DANIEL:  They have been told by the Business

18    Integrity Commission -- it's a city agency -- that they are not

19    allowed to deal with Mr. Calvo at this point.  So they

20    initially wanted to put up some cash.

21          THE COURT:  I see.  You mean they don't have to await

22    any kind of judicial decision as to Mr. Calvo's behavior, they

23    just go out and do whatever they want, is that it?

24          MS. DANIEL:  No.  They have been told that they cannot

25    employ him.

Proceedings

1          THE COURT:  Told by whom?

2          MS. DANIEL:  The Business Integrity Commission, which

3    is a city --

4          THE COURT:  Who is that?

5          THE DEFENDANT:  Your Honor --

6          THE COURT:  No.  I don't want you to say anything.

7          What's the Business Integrity Commission?  Are they my

8    partner here?

9          MS. DANIEL:  No.

10          THE COURT:  Well, I don't really care about the

11   Business Integrity Commission because I'm a federal judge, and

12   the Senate didn't make them the judge.  I don't care about what

13   they want to do.  It's only about what the Court wants to do.

14          I know I'm not arguing the point with you.  It's not a

15   disagreement.  It's just I can't take into account what some

16   agency of the City of New York wants to do.

17          I once worked for the City.  It doesn't -- I mean,

18   there are people all over the place making decisions in

19   New York City, some of which I agree with and some of which I

20   don't.  But I can't rely in any way, shape, or form on what

21   they do.

22          Are you telling me he is no longer employed by this

23   company?  Is that what you are telling me?

24          MS. DANIEL:  That's what I have been told by Nacirema.

25          THE COURT:  That's the point.  Tell me that -- I don't

Proceedings

8

1   want to know if he is no longer employed.  I just want to know

2   if he is employed.

3       MS. DANIEL:  They told me they have to terminate his

4   employment because of what this agency told them.  They are

5   very nervous.  He was also questioned by them, and they are

6   incredibly nervous.

7       Initially, they said they would put up an amount for

8   the case and yesterday they said, because of the contacts they

9   have had with these agencies, they will not put up anything.

10      THE COURT:  I will tell you something about how I view

11  parties contacting employers in connection with matters which

12  are properly before the Court, and I have said this before.  I

13  don't think that any agency of any government should be

14  contacting any company to say whether or not that entity or any

15  individual -- to say whether or not that entity should or

16  should not be supporting someone who is accused of a crime.

17  That's interfering with the process in this courthouse.

18      MS. DANIEL:  I agree with you, your Honor.

19      THE COURT:  I'm just telling you that's my view of it.

20      MS. DANIEL:  I agree with you, as well.

21      THE COURT:  I'm putting it on the record, because if

22  I'm going to have 62 defendants and then have companies being

23  told by some agency of the city government you can't support

24  this person or you can't give this person a loan because your

25  business may be affected by it, then that's interfering with

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    the litigation.

2         So this Business Integrity Commission better keep its

3    hands off my case.

4         MS. DANIEL:  I agree with you.

5         THE COURT:  You better tell them.

6         MR. BURLINGAME:  I will, Judge.

7         THE COURT:  Or they will be in here answering to me.

8         MR. BURKE:  Your Honor, we are going to order the

9    minutes, please.

10        THE COURT:  Business Integrity Commission, who are

11   they?

12        MS. DANIEL:  I agree with you entirely, your Honor,

13   and you know it was in yesterday's Daily News and it's made --

14        THE COURT:  I don't care for The Daily News, either.

15        MS. DANIEL:  It's made this company very nervous, and

16   it's prohibiting them from putting anything up.

17        THE COURT:  I understand your point.

18        My point is if there is going to be interference by

19   third parties in the process of defendants obtaining security,

20   all right, then they are interfering with the activities of the

21   Court.  That's my view of it.  I have said this.

22        I said this in the Bronson case.  There is ample

23   evidence of my views of this.  If you look back at the bail

24   proceedings in the Larry Bronson case, U.S. v. Bronson, where

25   it appeared to the Court that there may have been some

Proceedings

1  interference on the part of a third party in obtaining security

2  for Mr. Bronson's bond, I'm consistent about this.  It concerns

3  me that third parties are somehow engaged in interfering --

4  allegedly or potentially interfering in what the Court is

5  doing.

6        Now, I don't know what this defendant's relationship

7  is with the company he works for.  But if a third party is

8  telling the company he works for to fire him because of an

9  indictment, that undermines the presumption of innocence right

10 there.

11       MS. DANIEL:  Absolutely.

12       THE COURT:  It's like there is some -- there is a

13 penalty to be paid for being indicted for a crime when you

14 haven't been convicted of a crime.  I don't know what country

15 they are from.

16       MS. DANIEL:  I agree, your Honor.  And if this

17 defendant is out --

18       THE COURT:  I'm going to have him in here to tell me

19 why.

20       MS. DANIEL:  -- obviously we would like to have him

21 working.  So it's interfering with him in this manner.

22       THE COURT:  I'm going to subpoena them for them to

23 explain to me why they are interfering with my case.

24       MS. DANIEL:  I could not agree with you more.

25       THE COURT:  That's not the point.  The issue here is

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1  Mr. Burlingame has an appeal from Judge Bloom's decision, and

2  now I'm asking you what kind of security -- now that I have

3  said what I said about that kind of interference, what kind of

4  security are you proposing to provide on the 300,000?

5         You don't disagree with the $300,000 figure, do you,

6  or do you?

7         MR. BURLINGAME:  I do, Judge.

8         What we were originally seeking and what we tried to

9  establish was some uniformity across all the defendants in this

10 case.  And what we have been seeking for the defendants who we

11 judge to be sort of a similar level of, you know, exposure and

12 seriousness of the charges, was something in the neighborhood

13 of $700,000 for total of the bond, supported by around $300,000

14 in equity.

15        And, you know, just to restate, the charges here are

16 serious, and the defendant is a known associate of the Genovese

17 family.  He has ties to the underboss of the family.  He is on

18 recorded conversations saying that he has a weekly meeting with

19 the acting underboss of the Genovese family.

20        This is a serious guy we are dealing with.  He has the

21 means to flee.  He is facing serious charges, and I feel bad

22 that his lawyers are telling me that his life appears to not be

23 going well; but it seems to me that creates a further incentive

24 for him to flee, if he is going to be losing his job and losing

25 his marriage.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1       THE COURT:  How long has he been in negotiation to

2  terminate his marriage?  It may have predated the date of this

3  indictment.

4       MS. DANIEL:  Well, it certainly predated the date of

5  his arrest.  It's several months now, right?  Don't speak.

6       THE DEFENDANT:  Yeah.

7       MS. DANIEL:  I believe she told him she was going to

8  leave in October or November.

9       THE COURT:  How long has he been married?

10      MS. DANIEL:  Nine nears.

11      THE COURT:  How long has he lived in the New York

12  area?

13      MS. DANIEL:  The New York/New Jersey area, his entire

14  life.

15      THE COURT:  He was born in Queens?

16      MS. DANIEL:  Yes.  His entire life, I think.  He would

17  be in far worse condition by fleeing than by staying and facing

18  the charges.  I won't go through again how I broke down the

19  charges.  I believe it's on the record.

20      THE COURT:  I have it.

21      MS. DANIEL:  There are many counts, but it relates to

22  three discrete instances.  We did propose $30,000 cash.

23      THE COURT:  Where is this $30,000 cash?

24      MS. DANIEL:  It's coming from a friend of his.  I

25  believe it's his town supervisor's girlfriend who would be one

Proceedings

1    of the sureties.  She has an $80,000-a-year job.  She has been

2    employed, living in New Jersey for several years.  We have two

3    other gainfully employed sureties, subject to the government's

4    approval.

5              THE COURT:  How much do they make?

6              MS. DANIEL:  One of them, Ms. English, who is putting

7    up the money, makes $80,000.  The other surety makes $100,000 a

8    year.

9              THE COURT:  What does the other do?

10             MS. DANIEL:  He is a salesman for a linen company

11    called Unitex; and I haven't gotten the name of the third

12    surety yet because -- I haven't gotten it as of yesterday.

13             The judge did order a third surety.  I would have to

14    call the judge back and get the name of this third surety and

15    the cash.  So that's what the judge ordered, and that's what we

16    were going to satisfy.

17             I know these people were gainfully employed.  They

18    would be liable for a $300,000 bond, regardless.

19             MR. BURLINGAME:  Judge, the government's position is

20    simply that I think it's significant that the defendant has

21    been in the community his entire life, and that there is no one

22    who is willing to step forward and say, I agree that this guy

23    is going to, you know, I'm going to put my house on the line

24    that this guy is going to live up to the terms of his bond.

25    He's got a brother who owns property in the area.

Proceedings

1      THE COURT:  Where is his brother?

2      MS. DANIEL:  His brother has a co-op in Queens with

3   almost no equity.

4      THE COURT:  What does his brother do?

5      MS. DANIEL:  He's a salesman for a flower company.

6      This case has been designated -- will be designated,

7   I'm sure, a complex case, even for the defendants who are

8   facing one or two years.  So this case is going to last for

9   several years.

10      So to say to someone that you have to put your home

11   up, you can't sell it, you can't do anything, to say that, that

12   means no one is willing to step forward for him, I think, is a

13   little disingenuous.  It's a lot to ask for anyone.  Their

14   house will be encumbered for that period of time.

15      This case is undoubtedly going to last a very long

16   time.  Signing a bond is still a significant undertaking for

17   any surety, to be liable for several hundred thousand dollars.

18      MR. BURLINGAME:  The amount of cash involved here for

19   a guy who makes $100,000 a year and is extorting people to the

20   tune of $50,000 a year is not that much cash.

21      I don't know the amount of moral -- if we want to talk

22   about a $300,000 cash bond, then I would imagine the people who

23   are going to put this money up, it's a little harder to pay

24   them back if he decides he wants to leave.  But these are

25   serious charges, and the government is not seeking detention.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    We are not taking an unreasonable position.

2              We are just asking that a bond that's appropriate to

3    the seriousness of the charges and the seriousness of his

4    criminal background is set.

5              MR. BURKE:  His criminal background, he has no priors.

6    He is supposedly an associate of the Gambino --

7              THE COURT:  No, no.  Genovese he said.

8              MS. DANIEL:  Genovese.

9              MR. BURKE:  It depends on what paper you read, Judge.

10             THE COURT:  It's what the government told me just now.

11   I just want to correct it, because it could be both.  But if

12   you are saying it's Gambino, and he is saying it's Genovese --

13             MS. DANIEL:  No, I'm not.  I want to apologize.

14             THE COURT:  -- I want to clarify what you said.

15             MS. DANIEL:  I want to apologize.

16             Nonetheless, he has no prior convictions.

17             MR. BURLINGAME:  The government is taking that out of

18   the words of the witnesses found on tape.  We are not

19   stretching here.

20             MS. DANIEL:  He's in his fifties.  He has no prior

21   convictions.  This is hardly someone who has led a life of

22   crime.

23             If you read the allegations, I know he is in an

24   indictment with some very serious -- this indictment is with

25   people who committed murders, people who are facing gambling

Proceedings

1  charges.  The fact that it's one indictment is sort of

2  meaningless.  We have to look at what the defendant is charged

3  with.

4        THE COURT:  I'm looking at the ten counts he is

5  charged with.  I'm not looking at what anyone else is charged

6  with.

7        That's why at the outset I see that he is not charged

8  in the racketeering conspiracy count, count one, but he is

9  charged in ten counts, which accuse him of extortion,

10  conspiracy, check forgeries, mail fraud conspiracy, mail fraud,

11  embezzlement, et cetera.

12        So I understand what he is charged with.  I came here

13  prepared, you know, with that in my hand, that information in

14  hand.  So I'm only dealing with him.  So understand that I'm

15  only dealing with him.

16        MS. DANIEL:  Yes, your Honor.

17        One other thing, if I could just mention about his

18  detention.  He has been in there for six days.  Judge Matsumoto

19  ordered that he receive his medication.  He has not received

20  his medication for the six days there.

21        As your Honor is probably aware, that's not that

22  unusual, despite --

23        THE COURT:  What kind of medication does he take?

24        MS. DANIEL:  He takes a medication for a psychiatric

25  problem.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1          THE DEFENDANT:  No, ADD.

2          THE COURT:  No.  You have to talk through your lawyer.

3          MS. DANIEL:  No.  I'm --

4          THE DEFENDANT:  I'm sorry.

5          THE COURT:  You did that at the other hearing.  Never

6     say anything to the Court unless your lawyer says you can.

7     That's why you have two lawyers here.  So consult with them

8     first.

9          MS. DANIEL:  In any event, he has not received the

10    medication despite the order.  He has been in the hole for six

11    days, because apparently there were so many defendants arrested

12    at one time, apparently that is the reason.  It's not

13    behavioral.

14         He has not received his medication for that time

15    despite the Court's order.  And I think the Court needs to

16    consider the conditions of his confinement since he has been

17    detained, which have been dreadful.

18         THE COURT:  He has children?

19         MS. DANIEL:  He has four children.  Two grown

20    children, I believe 19 and 22, and he has two young children,

21    six and ten, who he is presently living with.

22         THE COURT:  Which ones?

23         MS. DANIEL:  This wife, even though they are getting

24    divorced, they are in the same home until they get divorced.

25         THE COURT:  And the grown children, what do they do?

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1  Are they in school, or are they working?

2          MS. DANIEL:  He said that his 19-year-old daughter is

3  in school, and his 22-year-old son is a construction worker.

4  And I might note, obviously, it's an enormous hardship for the

5  two young children, who he is fully involved with.

6          THE COURT:  I understand.  Now, tell me the

7  relationship he has with these proposed suretors.  Explain to

8  me what the relationship is.

9          The question of whether he will appear isn't somehow,

10  some way tied to whether it's important to him to have this

11  relationship.  If it's with his -- if the relationship is with

12  someone who is close to him, like a loving spouse, as opposed

13  to an estranged spouse, for the sake of discussion, then that's

14  one thing.

15          If the relationship is with someone with whom he has

16  tangential ties, then the likelihood that he would be concerned

17  about leaving that person high and dry are somewhat different.

18          MS. DANIEL:  I agree with that, your Honor.  These are

19  longstanding friends.  I don't have the name of the third

20  person, and obviously --

21          THE COURT:  Who is the first person?

22          MS. DANIEL:  Her name is Valerie English.  She is a

23  United States citizen.  She is a guidance counselor with the

24  Kearny, New Jersey school district.  She is the longstanding

25  girlfriend of a longstanding friend of Mr. Calvo's.

Proceedings

1     THE COURT:  Who is that longstanding friend?

2     MS. DANIEL:  I'm sorry.  What was that?

3     THE COURT:  Who is the longstanding friend?

4     MS. DANIEL:  Anthony Iacono.

5     I'm sorry.  Ms. English makes $85,000 a year.  She has

6  no priors, and she lives in Lyndhurst, New Jersey.

7     The second individual is Gregory J. Ianone.  I have

8  spoken to him several times.  He is also a longstanding friend

9  of Mr. Calvo's.  He is a United States citizen with no priors.

10  He is a salesman for the linen company Unitex.  He lives in

11  Ridgewood, New Jersey, and he makes $180,000 a year, and he has

12  been there for 26 years.

13     THE COURT:  Does he own his own home?

14     MS. DANIEL:  I spoke to Mr. Ianone.  He did not offer

15  anything.  I mean, he said he might be able to come up with

16  some cash.

17     THE COURT:  Well, if it's a good friend of the

18  defendant's, does the defendant know whether he lives in a

19  house or an apartment or in a tent?

20     MS. DANIEL:  He does live in a house, but he has not

21  offered that to us.

22     THE COURT:  Is he married?

23     MS. DANIEL:  No, he is not married.

24     As for the third person, I don't know the name of the

25  third person yet, unless it's Mr. Anthony -- or he will get

20

Proceedings

1   another longstanding friend.  Unfortunately, this defendant is

2   getting divorced, so.

3        MR. BURLINGAME:  So, Judge, what we have is the

4   girlfriend of a friend, a guy who is a longstanding friend of

5   the defendant's but is unwilling to put his house up, and

6   someone whose name we don't know.

7        Again, the government is not asking for permanent

8   detention.  We are asking for a reasonable bail package, and I

9   would also ask if the Court is inclined to approval of

10  something based on the suretors, based on a proposed set of

11  suretors, that pretrial service does a full work-up on all

12  these suretors to check into their histories and if any ties to

13  organized crime, given the defendant's background.

14       THE COURT:  Do you have anything else you want to say?

15       MS. DANIEL:  No, your Honor.  Just to reiterate,

16  because someone who doesn't want to put up their home because

17  it doesn't have a lot of equity because it's going to be

18  encumbered for three years.  If we need to come up with more

19  cash, we will come up with more.  I don't think it's fair to

20  say that they are not willing to sign up a house.

21       MR. BURLINGAME:  That's the whole point, somebody is

22  willing to put their life on the line.

23       MS. DANIEL:  What if someone wants to sell the house?

24       THE COURT:  Then they come back to the Court.  It

25  happens all the time.  We want to sell the house, we are

Proceedings

1   substituting some other property.  It happens every day all

2   over America, where a suretor provides the property as security

3   and then they want to sell the house, they want to put a new

4   mortgage on the house, they would rather put up cash than the

5   house, they want more flexibility.

6          These things happen, and certainly if that were to

7   take place in this situation, the Court would consider a

8   substitution.  That's really what it's all about.

9          MS. DANIEL:  There is no magic to just --

10          THE COURT:  I think the amount is too low.  Let me

11   just tell you this.  This is a defendant who is charged with

12   very serious crimes, and I can't minimize the significance of

13   these charges.  Whether or not the defendant is guilty of them,

14   you know, that's a question for another day.

15          I think the $300,000 bond, cover on the bond, is a

16   reasonable amount, but I think that at least $100,000 of it is

17   going to have to be provided in some form of security, such as

18   cash or equity on property.  And because otherwise, the bond

19   has no significance in a situation like this, where $30,000 in

20   cash from people who have -- it seems to me at this point,

21   based on what you have told me -- have a thin relationship with

22   this particular defendant, is simply inadequate to assure that

23   the defendant will not flee.

24          I think the government is not unreasonable in

25   requesting a more significant undertaking on the part of the

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1   defense in order to have the defendant released.

2          Here I note for the record that you have someone who

3   is making $85,000 a year as a guidance counselor.  How much is

4   she putting up?

5          MS. DANIEL:  She was going to put up the cash.

6          THE COURT:  All 30,000?

7          MS. DANIEL:  Yes.

8          THE COURT:  Well --

9          MS. DANIEL:  We will attempt to get together $100,000

10  cash.

11         THE COURT:  I think that's unreasonable.  It's not

12  sufficient, and I wouldn't want to see her in any event, and

13  I'm going to want to see her --

14         MS. DANIEL:  Oh, absolutely.

15         THE COURT:  -- to explain to her what the risks are

16  inherent in what she is doing, if $30,000 is her entire

17  savings, to put that up under these circumstances.

18         I have a responsibility to the suretor as well,

19  frankly, to make sure that this person is not taking an

20  unreasonable risk.  And if she is putting up the whole amount

21  and Mr. Ianone, who makes $180,000 a year and owns a house, is

22  putting up zip, nothing, zero, then I have some real questions

23  about whether he is real or imaginary in terms of his

24  willingness to take a risk here.

25         It's not a big risk to put up nothing and just sign

Proceedings

1   your name and hope that the government doesn't come after you

2   if the defendant absconds.  So it's just not sufficient.

3   $100,000 in property would be sufficient on the $300,000 face

4   of the bond, and then you can come back with your package and I

5   will review it.

6           Don't give it to a magistrate judge.

7           MR. BURLINGAME:  Could we request that we have a

8   pretrial services work-up on the suretors in advance?

9           THE COURT:  Of course.  Give pretrial the names and

10  all the information as to these individuals.

11          It may be possible for the defendant to find others

12  who can help out, too.  It's not necessary for people to put up

13  large sums of money, if you have more people.

14          So these are -- this is a 52-year-old person who has

15  lived his entire life in the New York area.  Unless he has been

16  hiding under a rock for 50 years, he must know other people

17  with whom he has the type of relationship where they would be

18  willing to help him out.

19          But that's something that you have to work out with

20  your client.

21          MS. DANIEL:  So if we can get $100,000 cash and three

22  suretors --

23          THE COURT:  That's right.

24          MS. DANIEL:  -- we'll do that.

25          THE COURT:  As to Ms. English, I'm not taking any more

24

Proceedings

1   than the $30,000 from her.  In other words, you have to find

2   other people such as Ms. Ianone (sic) or some other people who

3   have more resources because I don't want the U.S. Government

4   going after Ms. English's pension in order to pay off the

5   $300,000 debt, if the defendant were to abscond.

6           MS. DANIEL:  Well, I think that money that she has may

7   also be joint money with her boyfriend, Anthony.

8           THE COURT:  Who is Anthony?

9           MR. BURKE:  Iacono.

10          THE COURT:  Oh, yes, Anthony.  Then he is a suretor,

11  too.  Put him on the bond, if it's not her money.

12          MS. DANIEL:  Jointly, jointly.

13          THE COURT:  You said that she would be the suretor.

14  If it's joint money, they both have got to be suretors and they

15  both have got to be vetted by pretrial.

16          MS. DANIEL:  Certainly.

17          MR. BURLINGAME:  Right.

18          THE COURT:  Anything else?

19          MR. BURLINGAME:  No, Judge.

20          THE COURT:  Thank you.  Have a nice day.

21          MR. BURLINGAME:  Thank you, Judge.

22          THE COURT:  Call me when you are ready to -- you want

23  to be relieved?

24          MS. DANIEL:  I assume, unless he needs help.

25          MR. BURKE:  I need help.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

25

Proceedings

1       MS. DANIEL:  May I stay on for today?

2       THE COURT:  Stay on for today.

3       MS. DANIEL:  I will assume at the end of today I am

4    relieved.

5       THE COURT:  Just send me a letter requesting to be

6    relieved, and I will relieve you on the record at that time,

7    once you are done.

8       MS. DANIEL:  So maybe I will send you a letter

9    tonight.

10       THE COURT:  Tonight or tomorrow is fine.

11       And you put in your notice of appearance, sir?

12       MR. BURKE:  I just talked about it.  I will do it by

13    mail tonight or e-mail.

14       THE COURT:  Please do so, so we are covered.

15       MS. DANIEL:  Do I need to appear again?  No, just

16    write you a letter?

17       THE COURT:  Just write me a letter.

18       MS. DANIEL:  And I will stay with him as long as he

19    needs to today.

20       THE COURT:  All right, Mr. Burke.  All right.  Have a

21    nice day.

22       MR. BURKE:  Thank you, Judge.

23       (End of proceeding.)

24

25

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York