1

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF NEW YORK

**ORIGINAL**

3  ---------------------------------------x

   UNITED STATES OF AMERICA,

4

                              Plaintiff,        Docket No.:
5                                               08 CR 76 (NGG)

          versus
6                                               U.S. Courthouse
   NICHOLAS CALVO,                              225 Cadman Plaza East
7                                               Brooklyn, NY 11201

                         Defendant.
8  ---------------------------------------x
                                                February 14, 2008
9                                               10:30 a.m.

10      Transcript of Criminal Cause for Status Conference

11 Before:   HONORABLE NICHOLAS G. GARAUFIS,
                              District Court Judge
12

13                         APPEARANCES

14 For the Government:        BENTON J. CAMPBELL, ESQ.
                              United States Attorney
15                            Eastern District of New York
                              271 Cadman Plaza East
16                            Brooklyn, New York 11201
                              BY:   ROGER BURLINGAME, ESQ.,
17                                  DANIEL BROWNELL, ESQ.,
                                    Assistant U.S. Attorney
18

   For the Defendant:        EMILY R. DANIEL, ESQ.
19                            69 West 9th Street, Suite 6J
                              New York, New York 10011
20
                              BURKE, MIELE & GOLDEN, LLP
21                            100 Washington Avenue
                              Suffern, New York 10901
22                            BY:  PATRICK T. BURKE, ESQ.

23 Also Present:              TERRI FEINSTEIN SASANOW, ESQ.
                              New York City Law Department
24                            Office of the Corporation Counsel
                              100 Church Street
25                            New York, New York 10007-2601

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

```
1    Appearances (continued):

2                                   BUSINESS INTEGRITY COMMISSION
                                    100 Church Street
3                                   New York, New York 10007
                                    BY:  MICHAEL J. MANSFIELD
4                                        SHERYL LEVINE, ESQ.

5    Court Reporter:                MICHELE NARDONE, CSR, RPR
                                    Official Court Reporter
6                                   225 Cadman Plaza East
                                    Brooklyn, New York 11201
7                                   Phone:  718-613-2601
                                    Fax:  718-613-2631
8
     Proceedings recorded by mechanical stenography.  Transcript
9    produced by computer-aided transcription.

10                              *   *   *

11        (In open court.)

12        (Defendant present.)

13        THE CLERK:  United States versus Calvo.

14        MR. BURKE:  Good morning, your Honor.

15        THE CLERK:  Counsel, please state your appearances.

16        MR. BURLINGAME:  Good morning, Judge.  Roger

17   Burlingame for the United States.  I'm joined by Daniel

18   Brownell, who is also an AUSA in our office, and Terri Sasanow.

19        MS. SASANOW:  I'm representing the Business Integrity

20   Commission and Michael Manning (sic).  Good morning, your

21   Honor.

22        THE COURT:  Welcome.

23        MR. BURKE:  Your Honor, Patrick Burke again.  I had a

24   very brief application when I came in on Monday.  I anticipated

25   that I would in fact be retained, but when I spoke to the
```

Proceedings

1   friends of the defendant they said they really couldn't retain

2   me on his behalf.  So I'm willing to do whatever I can, but I

3   have got to ask the Court -- I didn't actually file the notice

4   of appearance yesterday.  I had anticipated that I would, but I

5   would ask the Court in this sort of embryonic stage to relieve

6   me of whatever responsibilities I have.

7           THE COURT:  Well, how can I relieve you of something

8   that you haven't agreed to do?

9           MR. BURKE:  I did tell the Court.

10          THE COURT:  You told the Court, but you said you were

11  going to file a notice of appearance, presently.

12          MR. BURKE:  Yes, and I haven't.

13          THE COURT:  Well, Ms. Daniel?

14          MS. DANIEL:  I guess I'm back in.  I filed a letter

15  with the Court yesterday.

16          THE COURT:  I approved you getting out.  I'm as

17  efficient as you are.

18          MS. DANIEL:  I guess I'm back in, if the Court wants

19  me and if Mr. Calvo wants me back in.

20          THE COURT:  I don't think that's a real issue.  You

21  were appointed.  I'm not going to unappoint you, if there is no

22  counsel in place.

23          If at some point the defendant retains someone, then

24  we will face that, if and when it happens.  In the meantime, it

25  would seem that you have -- we have an affidavit, do we, from

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings                                    4

1   defendant as to his financial situation?

2              MS. DANIEL:  I would --

3              THE COURT:  Something has to be submitted to the Court

4   on that?

5              MS. DANIEL:  I will have it filled out tonight.

6              THE COURT:  The indication that counsel said is some

7   friends or relatives of the defendant were going to retain

8   someone on his behalf.

9              MS. DANIEL:  As to the financial affidavit, he is

10  presently incarcerated.  I don't think we are able to make the

11  bail conditions at this time.  He also has been told that he

12  can't work, obviously.

13             THE COURT:  We are getting to that.

14             MS. DANIEL:  Right.  So even if he were to be released

15  and we were to satisfy the bail conditions, I would assume at

16  this time he was financially unable to pay an attorney.  If we

17  are able to satisfy the bail and he is able to work then I

18  assume he would not be entitled to counsel at that time, but

19  that hasn't happened yet.

20             MR. BURKE:  I will leave, your Honor.  Thank you.

21  It's a pleasure.

22             THE COURT:  Okay.  All right.  The purpose of this

23  appearance is to deal with certain information that was

24  provided to the Court at the last appearance, having to do with

25  communications of the Business Integrity Commission to the

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

5

1  defendant's employer.

2        Could you just go over that for me.

3        MR. BURLINGAME:  Judge, I actually think that I could

4  give you a brief background and I think one of the issues has

5  been mooted based on a conversation I had with Ms. Daniel last

6  night, which is I think the original issue that your Honor was

7  upset about was that an understanding that Nacirema,

8  Mr. Calvo's former employer, had wanted to sign on as a surety

9  on his behalf and that the Business Integrity Commission had

10 stepped in and somehow prevented that from happening.

11       I was talking to Ms. Daniel last night and said it was

12 my understanding that's why we were having a hearing this

13 morning, and she said that was a misunderstanding on my part as

14 well as I guess maybe the Court's part as to what her

15 representation was concerning the Business Integrity

16 Commission's role and in fact it had not stepped in and sort of

17 blocked Nacirema from becoming a suretor and so that squares

18 with the information we have since been provided from the

19 Business Integrity Commission, which is that they had no

20 contact with Nacirema whatsoever.  So I think that issue is

21 mooted.

22       MS. DANIEL:  Your Honor, that is not a correct

23 rendition of our telephone conversation.  I was telling him

24 what I believe was specifically said to them.  I would note

25 that in Monday's Daily News -- I will read it to the Court,

Proceedings

6

1   "Last week the city Business Integrity Commission terminated

2   Nacirema's permission to employ Calvo."

3          The Business Integrity Commission, as far as I know,

4   did have conversations with Nacirema.  They were signed on.

5   What I had said to Mr. Burlingame was I don't know if they

6   specifically said they can't be sureties but my understanding

7   was they basically said for them to cut their ties from

8   Mr. Calvo, which made them basically cut their ties from

9   Mr. Calvo.

10          They basically have an -- he said I'm part of the

11   integrity monitoring team for Nacirema and based on the

12   allegations contained in the indictment as well as a letter

13   from the Business Integrity Commission --

14          THE COURT:  Absolutely.

15          MS. DANIEL:  -- the future employment of Mr. Calvo

16   would jeopardize the company's licensing.  Also, the decision

17   to terminate Mr. Calvo is final.  Based on that, they decided

18   they would not be sureties for Mr. Calvo.

19          I note that prior to Monday morning Nacirema had told

20   me that they were going to provide sureties and they were going

21   to provide some money, provided that the financial amount was

22   something they could come up with.

23          Monday morning I heard from a friend of the

24   defendant's, a gentleman named Anthony, that Nacirema had

25   decided based on their contacts with the Business Integrity

Proceedings

7

1    Commission not to provide any sureties and not to provide any

2    money.   In his words, they were told to cut their ties with

3    Mr. Calvo.

4         So my only dispute with Mr. Burlingame was to the

5    exact language.   I don't know if they were specifically told

6    not to be sureties, but according to Anthony they were told to

7    cut their ties with Mr. Calvo and to not employ him, and as far

8    as I know based on that they decided not to be sureties for

9    Mr. Calvo.

10        The defendant's brother called me last night, and he

11   told me that exactly what is in this letter that Nacirema told

12   him, that if they were to act as sureties or provide any money

13   they would lose their licensing.   So clearly there was some

14   contacts with them.

15        They had not been returning my calls or Mr. Burke's

16   calls.   I mean Mr. Burke can maybe tell you what contacts he

17   had with them, since I believed I was out of the case as of

18   Monday night.

19            THE COURT:   You are back.

20            MR. BURKE:   Thank you, your Honor.

21        The other thing I can add to what Ms. Daniel has, the

22   press release from the city by the commission indicated that it

23   in conjunction with the United States Attorney's office had

24   told Nacirema to sever ties with the defendant and, based upon

25   that, Nacirema, which was at one time considering posting bail,

Proceedings

1  said we are not going forward because our business is in

2  jeopardy.

3       THE COURT:  All right.  Okay.  Let me hear -- let me

4  hear from the city.

5       MS. SASANOW:  Thank you, your Honor.

6       THE COURT:  Your name again?

7       MS. SASANOW:  My name is Terri Sasanow.

8       THE COURT:  Sasanow?

9       MS. SASANOW:  Sasanow.

10      THE COURT:  Ms. Sasanow, welcome.

11      MS. SASANOW:  Thank you very much, your Honor.  If I

12 may set out the facts and the background to this, your Honor,

13 which I think may be helpful, the Business Integrity Commission

14 is the successor to the Trade Waste Commission, New York City

15 Trade Waste Commission, which was established in 1996 pursuant

16 to local law 42 of that year.  The purpose of that law was to

17 set up a complex and extensive regulatory scheme to regulate

18 the commercial carting business in the City of New York based

19 upon years of investigation, culminating in a prosecution by

20 the New York County District Attorney that found that the

21 commercial carting business was controlled by a cartel

22 comprised of all of the organized crime families in the City of

23 New York.

24      As a result of that, a very comprehensive regulatory

25 scheme was enacted by the New York City Council.  Under that

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

9

1  scheme, the commission has the power to license trade waste

2  companies, and one of the factors that they may take into

3  consideration in granting or refusing to grant or denying

4  renewal licenses is whether the company associates with

5  publicly identified members or associates of organized crime.

6  That is one of the factors, which is specifically set out in

7  the administrative code, that the agency may take into

8  consideration when they make that discretionary determination.

9       A facial challenge to the constitutionality

10 specifically of that aspect of the statute was challenged the

11 day after the statute was enacted.  The constitutionality was

12 upheld by the Second Circuit in a case called Sanitation

13 Recycling Industries.  I have a copy of the case here, your

14 Honor.

15      In any event, the license of Nacirema industries is up

16 for renewal and is pending before the Business Integrity

17 Commission at this time.  In connection with their renewal

18 application last summer, they disclosed to the commission for

19 the first time that they employed Nicholas Calvo in a

20 managerial position, and as a result of that disclosure they

21 were required under the statute to submit a background

22 investigation form of Mr. Calvo.  That form was not submitted

23 to the commission until January 28 of this year.

24      Under section 16-509 -- I'm sorry, 16-510(a), the

25 commission has, after they received that form and they have

Proceedings

1   reason to believe that the manager lacks integrity, they have

2   ten days to notify the company whether they may continue to

3   employ that person.

4         Ten days after the form was submitted by Mr. Calvo,

5   the indictment was announced in this court, and there was a

6   public press conference by the United States Attorney and other

7   individuals in which the United States Attorney publicly

8   identified Mr. Calvo as an associate of the Genovese organized

9   crime family.  Based on that indictment and the press

10  conference and all of the information that was made public on

11  that date, special counsel to the Business Integrity Commission

12  wrote a letter to Nacirema and said based on the crimes charged

13  in the indictment and the identification of Calvo as an

14  organized crime figure, the commission finds that the addition

15  of such employee, quote, may have a result inimical to the

16  purposes of local law 42, citing section 16-510(a)(2) of the

17  administrative code of the City of New York.

18        Then counsel went on to say, quote, Accordingly, you

19  are hereby directed that Nacirema may not employ Calvo pending

20  the completion of the commission's investigation.  Please

21  contact me if you wish to demonstrate to the commission that

22  the addition of Calvo pending completion of investigation would

23  not have a result inimical to the purposes of local law 42.

24        So the BIC gave Nacirema an opportunity to respond to

25  that charge.  On February 8, the next day, Ronald Tobia, who is

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    a lawyer and part of the integrity monitoring firm that

2    Nacirema retained voluntarily, notified BIC that they were

3    voluntarily terminating Mr. Calvo's employment.  It says in the

4    letter Mr. Calvo was an at-will employee working under a sales

5    agreement with the company.  Mr. Calvo has been instructed not

6    to return to Nacirema's premises, not to communicate with any

7    Nacirema employees, and to correspond any questions to his

8    legal counsel.  There was never any discussion between BIC and

9    Nacirema or the integrity monitor as to the question of

10    Mr. Calvo's bail.

11            Subsequently I am advised that when Nacirema's counsel

12    heard of this proceeding here this morning they contacted BIC

13    and said that they on their own sua sponte had decided not to

14    do so.

15            THE COURT:  Not to do so what?

16            MS. SASANOW:  Not to provide bail for Mr. Calvo.  They

17    notified BIC that they were not going to do that; and I point

18    that out, your Honor, because they do have a pending renewal

19    license application pending under 16-509(a) of the

20    administrative code.

21            One of the things that the commission may take into

22    consideration is whether the licensee has ties to organized

23    crime.  I am sure, or it's reasonable to assume that Nacirema

24    was concerned that if they did provide bail that that was

25    something that might reflect adversely on their application for

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1  renewal license, but that was not something that BIC

2  communicated to Nacirema.

3       THE COURT:  Could the commission properly adversely

4  affect the renewal of a license based upon the decision of an

5  entity to provide security for bail for a former employee?  Is

6  that something that the commission could do, and has it ever

7  done so?

8       MS. SASANOW:  Well, to my knowledge it has not done

9  so.  What it may take into account -- and I'm not saying what

10  they are going to do because they haven't taken any action yet,

11  but what they may consider is whether there is a business

12  nexus, whether there is a business tie, between the company and

13  publicly identified members of organized crime.

14       Now, what they would do in this instance, if surety

15  was provided, I don't know.  That's something that has not

16  happened yet.  But certainly that's a decision that's being

17  made by Nacirema on their own, without any input from the

18  commission, and based on its reading of the statute and the

19  fact they have their own integrity monitor.

20       They are making a decision on their own.  They are

21  looking at the statute, they are saying this is what it

22  provides, and they are making a decision.  It has nothing to do

23  with BIC.

24       BIC has not had any communication with them on this

25  issue whatsoever, and certainly the correspondence between the

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    agency and the findings that the agency made had nothing to do

2    with that.  It simply had to do with the employment, and that

3    was done pursuant to the specific provisions of the

4    administrative code.  They gave Nacirema time to respond, and

5    they chose not to.

6          THE COURT:  I have heard you.  Did you want to say

7    anything about that?

8          MS. DANIEL:  Well, your Honor, I obviously wasn't

9    present for any conversations between Nacirema and the Business

10   Integrity Commission, so I don't know what was said.

11         The only thing I know that I can add to this is that

12   they initially were agreeing to put up the sureties, agreeing

13   to put up the money.  They were actually going to have some

14   sureties and someone with some sort of check Monday morning,

15   when I got a message from a friend of the defendant's, Anthony,

16   that Nacirema felt that they had to cut any ties with Mr. Calvo

17   and that they were way too nervous to provide any sort of bail

18   or any sort of bail package and that the defendant was now

19   going to have to rely on friends who would attempt to get a

20   bail package together.

21         I did call Nacirema after that and I said you need to

22   let me know if you are now backing out because you are nervous

23   because of the committee's communications, and he said we will

24   not be providing anything.

25         THE COURT:  Okay.  Now, let me just point out a few

Proceedings

1    things.  I'm looking at the press release from the Business

2    Integrity Commission.  And I note that at least three members

3    of that commission are listed as having been involved in the

4    press conference that announced the indictment.  You have got

5    the commissioner of investigation, you have got the -- you have

6    got the chair of the commission, and you have got the police

7    commissioner.  I think that's three out of what, five.

8         So how many members are there of this Business

9    Integrity Commission?

10        MS. SASANOW:  Six.

11        THE COURT:  You got half.  So you got half of them.

12   So basically, you know, if this were a third party, all right,

13   and the investigation by the Business Integrity Commission were

14   separate and apart from bringing the indictment, the groups

15   participating in bringing the indictment, then I would say

16   there is a line of demarcation, a fire wall or whatever, but

17   what we have here is a situation where the people who are

18   involved in the prosecution basically are also voting on the

19   Business Integrity Commission on the licensure of that

20   particular company.

21        Now, it's clear to me from the regulations, which I

22   have reviewed, that the Business Integrity Commission can

23   refuse to issue a license, a license, based on any number of

24   requirements, including taking into consideration the pendency

25   of an indictment or criminal action against an applicant.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    There are -- I'm not quibbling with the rules, but my question

2    has -- what my question has to do with is whether this entity

3    has any authority to affect a license based upon the

4    willingness of a company or an individual to assist in the

5    providing of security for bail, and that's really my concern,

6    that all of a sudden, irrespective of whether Mr. Calvo is

7    employed or not employed by this company, under these rules,

8    whether there is, there has been some implicit or explicit

9    threat upon the company --

10           MS. SASANOW:  No.

11           THE COURT:  Let me finish.

12           -- as to assisting him with his bail conditions, which

13   affects the Court because the Court sets the bail requirements

14   and then the defendant has to go out and meet those

15   requirements or defendant remains in jail until the outcome of

16   the case.  So that's the Court's concern, and there is this --

17   and there is this relationship between the members of this

18   commission with the prosecution itself.

19           It's not a separate entity.  You have got three

20   members of the commission who stood up at a press conference

21   when the indictment was announced.  And I'm concerned that

22   there is some sort of inappropriate pressure being placed upon

23   these third parties as to assisting this defendant in obtaining

24   the security that he needs for his bail.  That's really all

25   that the Court is concerned about.

Proceedings

1      I'm not worried about the constitutionality of the

2  commission.  I don't want to interfere with their -- the

3  process that they engage in to license a company.  I'm not even

4  concerned about whether some company is obligated to fire the

5  defendant or not use his services because he is under

6  indictment, although I do have some issues about whether the

7  constitution has been set aside.

8      There is a provision somewhere in there that says that

9  a person is innocent until proven guilty of a crime.  And so I

10 don't know that if I were sitting on this commission I would

11 necessarily have the same views as some other commissioners on

12 that subject.  That put aside, I'm only concerned about whether

13 there is some explicit or implicit pressure being placed upon

14 individuals not to provide security in connection with a bail

15 package for this defendant or any other defendant.  That's the

16 issue, and I don't think you can answer that question.

17      MS. SASANOW:  Well, if I may --

18      THE COURT:  Because you are just here to say whatever

19 the city wants you to say.

20      MS. SASANOW:  Well, Mr. Manning is here.

21      THE COURT:  Then Mr. Manning should get up here then.

22      MS. SASANOW:  If I may, your Honor, respectfully,

23 before he does, the representations that have been made to your

24 Honor by Mr. Calvo's counsel are not based on personal

25 knowledge and are not based on --

Proceedings                                            17

1         THE COURT:  Neither are yours.

2         MS. SASANOW:  Well, Mr. Manning --

3         THE COURT:  Neither are yours.

4         MS. SASANOW:  Your Honor, **Mr.** Manning is here.

5         THE COURT:  Please don't ever tell me that she doesn't

6    have personal knowledge when you don't have personal knowledge.

7    That's why I asked Mr. Manning to come.  Come on up,

8    Mr. Manning.

9         MS. DANIEL:  Can I add something, your Honor?

10        THE COURT:  Yes, Ms. Daniel.

11        MS. DANIEL:  During the bail hearing two days ago

12   before this Court and during the bail hearing before Magistrate

13   Bloom, the government several times said why doesn't the

14   defendant have Nacirema as a surety.  I think that was

15   incredibly disingenuous, knowing that they --

16        MR. BURLINGAME:  It's not true.

17        MS. DANIEL:  If I read the press release, acting in

18   conjunction with the office of the United States Attorney,

19   Eastern District of New York, the New York City Business

20   Integrity Commission, they were behind this as well.  So to

21   argue repeatedly that the bail has to be increased because

22   Nacirema is not going forward, when they know that --

23        MR. BURLINGAME:  Judge, that's absolutely incorrect.

24        THE COURT:  You will get your chance.

25        MS. DANIEL:  -- exerted pressure on Nacirema, I would

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

18

1   say is disingenuous at best.  In addition to which, anyway --

2          MR. BURLINGAME:  Judge, there is as much truth to that

3   statement as there was to defense counsel's statement that your

4   review of Mr. Calvo's bail was to be conducted according to a

5   clear error standard of review.

6          I would invite the Court to print up the transcript of

7   Tuesday's bail hearing and see.

8          THE COURT:  I was there.  I remember.

9          MR. BURLINGAME:  Right, and at no point was the

10  government saying why is Nacirema not signing on as a suretor,

11  and I would also point out that many times defense counsel was

12  representing that Nacirema had specifically been contacted by

13  the Business Integrity Commission and told not to serve as a

14  suretor, which I think is what got the Court so upset in the

15  first place.  Now she has backed off that statement, which is

16  what I was told last night, which is why I represented I

17  thought this was moot.

18         MS. DANIEL:  I never specifically said that.

19         MR. BURLINGAME:  There are a number of varying and

20  inexplicable facts.

21         THE COURT:  We have Mr. Manning here.

22         MS. SASANOW:  Mansfield, I'm sorry.

23         THE COURT:  Mr. Mansfield is a person whose background

24  and integrity are well respected.  I know he has been in the

25  district attorney's office in Queens County for many years.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings                                    19

1   He's just been appointed -- isn't he fortunate -- to this

2   position recently.

3        And my question of Mr. Mansfield is:  Does the

4   commission take any position on whether a regulated company

5   can -- or its principals can provide bail or assist in

6   providing bail for a former employee or a current employee?

7   That's really my question.

8        MR. MANSFIELD:  Judge, the short answer to that is no.

9   If you are asking whether the commission would look into a

10  regulated company, if they were to post bail for an individual

11  who has been publicly identified as being associated with

12  organized crime, the commission would conduct an inquiry as to

13  the business reason why that would be being done.

14       If it's on a personal relationship with the

15  individual, that's something that would be taken into account.

16  But the standard that the commission uses is to ascertain the

17  good character, honesty, and integrity of its licensees and its

18  registrants, and if -- and I stress if -- the posting of that

19  bail went to the good character, honesty, and integrity of the

20  entity that we license or register, then there is a possibility

21  that we would take that into account.

22       Now, your Honor, with respect to Nacirema, a member of

23  my staff had conversations with the attorneys that were

24  retained by Nacirema because they are very concerned about

25  their good character, honesty, and integrity; and they have

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1   retained a law firm for the purpose of integrity monitoring.

2   The representation that was made to the Business Integrity

3   Commission was twofold.  They received our letter that

4   Mr. Calvo was under an employment contract that had an honesty

5   clause in the contract.

6        They had every intention of terminating his

7   employment, irrespective of us sending a letter that was

8   coincidental in its timing with the indictment, and in addition

9   to that, members of the integrity monitoring firm offered to be

10  here to testify to the fact that they had no intention of

11  keeping his employment and they had absolutely no intention as

12  a corporate entity putting up a surety for Mr. Calvo.

13       THE COURT:  At any time?

14       MR. MANSFIELD:  At any time, Judge, and they were

15  quite emphatic about that when they spoke to our agency.  We

16  took no role.

17       We had no conversations with Nacirema with respect to

18  them putting up a surety.  The first we had heard about it,

19  quite frankly, was when we received the order to show cause

20  from your Honor.

21       MS. DANIEL:  I can respond to that.  I unequivocally

22  spoke to Nacirema, who unequivocally told me --

23       THE COURT:  Who did you talk to?

24       MS. DANIEL:  To Mr. John Davis and to Mr. Ron Tobia.

25       THE COURT:  Who are they?

Proceedings

1        MS. DANIEL:  John Davis is the operations manager and

2   Ron Tobias is an attorney.  They also had a bail bondsman

3   called Scott Berlin call me Saturday.  So I spoke to him.

4        So it was clear -- I don't know what the operation of

5   their minds are obviously, but they were going to have sureties

6   and some amount of money Monday morning; and I would also say

7   at this point obviously Nacirema is nervous enough that I can't

8   force them to be sureties.

9        THE COURT:  No one can force anyone to do anything.

10        The question is whether -- for the Court the question

11   is whether the representatives of this commission used pressure

12   to deter people from providing security for bail for this

13   defendant and whether that, if it was done, whether it was

14   proper or whether it was improper.  I think that when you raise

15   the issue, you and Mr. Burke, I was deeply concerned because I

16   have had that problem -- you weren't here at the last meeting,

17   sir -- in the past, where a firm, it was represented to me,

18   that a firm had interfered with a family member employed by

19   that firm from providing funds or real estate, some security,

20   in connection with a bail application for defendant.

21        And so I'm very sensitive about that because, frankly,

22   it's one thing for a company to follow whatever these

23   procedures are and to meet the requirements for its operation

24   and its participation in certain business activities, and it's

25   another if principals of a firm or if the firm itself wishes to

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings                                                22

1   assist an employee or former employee to have bail while he's

2   under indictment, that's I think, you know, an entirely

3   separate issue.  If the long arm of this commission can

4   influence a regulated entity from providing that kind of

5   assistance to an employer or former employee and if this

6   commission can reach some determination as to the motives of

7   those individuals or that company, which is what this really

8   comes down to, it's about motive.  All right.

9        And I've got three of the commissioners are standing

10  up at the press conference where the indictment was announced.

11  Why shouldn't these three people be recused from considering

12  this altogether as to this company?  Because they already have

13  reached a conclusion about this individual and perhaps this

14  company.  They certainly don't have the independence and the

15  open mind, it would seem to me, to be reviewing the application

16  of such an entity.  Those are some of my concerns.

17       MR. MANSFIELD:  All right, Judge.  You raise a number

18  of different issues.

19       THE COURT:  I know there are a lot of issues here.

20       MR. MANSFIELD:  I think, with all due respect, the

21  issue that I believe you were most concerned about from your

22  order to show cause was the issue involving our position -- and

23  when I say "our" I'm talking about the Business Integrity

24  Commission -- with respect to the surety, and I can state

25  unequivocally that conversation never, and I underscore never,

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    occurred between a member of my staff and Nacirema.  I've got

2    the universe of my staff who were involved in that present in

3    the courtroom today, and Sheryl Levine, my special counsel, is

4    the one that had those conversations.

5           Now, with respect to the broader issues that you are

6    addressing, Judge, the Business Integrity Commission is both a

7    law enforcement and a regulatory agency, and we participate

8    with law enforcement agencies, prosecutorial agencies

9    throughout the tristate area in criminal investigations as well

10   as our regulatory component.  We have standards that we utilize

11   when we are going to deny or grant a license.  It is not -- it

12   is not an amorphous standard.  It's very clear.

13          As corporation counsel has already indicated, those

14   issues have already been brought before the Second Circuit, in

15   terms of constitutionality of the statutes and the standard

16   which we use.

17          THE COURT:  I understand that.  I'm concerned about

18   the case that's before me.  I'm concerned about managing the

19   case that's before me and the question of whether a defendant

20   is able to put together the bail package so that he can be

21   released prior to trial.  That's my job.

22          MR. MANSFIELD:  I understand, Judge.

23          THE COURT:  And so any time there is a claim that

24   there is interference in that -- you know, I'm not saying you

25   are unconstitutional.  The Second Circuit dealt with it and the

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1   Second Circuit has spoken, and I don't want to address it.

2          What I want to address is whether if the president of

3   this company decides to put up his house for this defendant is

4   that something that the Business Integrity Commission is going

5   to examine in determining whether that business should be

6   licensed in the future.

7          MR. MANSFIELD:  Judge, if you are asking me will we

8   look at that, will we look at that issue, if it goes to the

9   good character, honesty, integrity of Nacirema, that would be a

10  factor that we would look at.

11         THE COURT:  I don't know what that means.  That's

12  lawyer talk.

13         MR. MANSFIELD:  Well, good character, honesty, and

14  integrity is a standard in our statute, and as a corporate

15  entity the issue becomes why is a corporate entity -- and it's

16  a motivational issue -- why is a corporate entity putting up a

17  surety for an individual who has been publicly identified as

18  being involved with organized crime.

19         THE COURT:  I didn't say an entity.  I said an

20  individual.

21         MR. MANSFIELD:  Judge, an individual is different.

22         THE COURT:  I didn't ask you about the entity.

23         Look, I specifically asked you a question about an

24  individual, not about the corporate entity.  I understand the

25  argument about the corporate entity and its assets and so on.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1  If the president of a company is the best friend of the person

2  who has been indicted, and the president of the company or his

3  spouse or his child or somebody decides to put up, you know, a

4  house with $100,000 in equity toward bail, is that something

5  that you could -- and this is not specific to this case -- but

6  that this commission could consider that goes to the standards

7  that you are obligated to investigate?

8          MR. MANSFIELD:  Is it something we can look at, the

9  answer to that is yes.  The fact pattern that you just gave,

10  about it being a personal friend or a family member, I am sure

11  we have had that many times, where bail has been put up by a

12  principal of a company that is licensed by us and it has not

13  affected their license.

14          So, you know, it's difficult to answer it other than

15  to say it is something that the commission would be concerned

16  about, but if it's a family member or a personal friend

17  relationship, other than in the individual's capacity as a

18  principal of the company, that's a different story, Judge.

19          THE COURT:  I understand your point, and there is no

20  desire on the part of the Court to have any kind of chilling

21  effect on your ability to do your job.  I think it's an

22  important job and you need to do it without constraint.

23          On the other hand, I have a concern about a defendant

24  who is sitting in jail.  I have set the requirements for bail,

25  and I'm concerned about the chilling effect upon his rights and

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    also the rights of the person who is going to put up the bail

2    money perhaps.

3          If the impression is that by providing bail the entity

4    or the individual has an adverse inference against the

5    organization or the individual created as a result that the --

6    that there is something about it that's untoward.

7          MR. MANSFIELD:  Judge, you know the facts --

8          THE COURT:  And the other problem is that you have got

9    your commissioners are all part of this -- engaged in this

10   litigation because they stood up together and it's in your

11   press release, and I mean it's just -- it might be piling on.

12         My job, I'm here to make sure that we don't prejudge

13   these defendants and we don't put them in jail unnecessarily

14   before they have their day in court.

15         MR. MANSFIELD:  Judge, with all due respect, the issue

16   of members of the commission being involved in the

17   investigation and being involved in the press conference for

18   that matter is, in my opinion, most respectfully, is a totally

19   different issue.

20         We participate in investigations, and we also --

21   criminal investigations, and we also have a regulatory

22   component also that has standards that I have already spoken

23   to.  But I think the best way to address this issue, Judge, is,

24   quite frankly, you know, we are speaking on behalf of the

25   principals of Nacirema.  Nacirema should really speak to you

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1   directly, because the conversations that we had with Nacirema

2   and the conversations that defense counsel had with Nacirema

3   seem to be 180 degrees apart.

4          THE COURT:  Do you have conversations with regulated

5   parties other than on paper or at hearings where you have a

6   court reporter?  Are there these friendly discussions that you

7   have with your regulated parties?

8          MR. MANSFIELD:  There are discussions we have with our

9   regulated parties.  I wouldn't be in position to characterize

10  them as friendly or unfriendly.

11         THE COURT:  Informal.

12         MR. MANSFIELD:  Informal.  Our attorney speaks to them

13  on a regular basis because they are always having issues with

14  respect to some licensing matters, and the individual who

15  handled this case is our special counsel, Sheryl Levine, who is

16  present now, and she is the individual who informed me that

17  Nacirema's position was unequivocal.

18         THE COURT:  Could she just come up and so she can -- I

19  could just briefly hear from her about this.

20         MR. MANSFIELD:  Again, Judge, I think the best

21  evidence here would be to have one of the principals of

22  Nacirema say what was said to us.

23         THE COURT:  Ms. Levine, just state your name, ma'am.

24         MS. LEVINE:  Sheryl, S-H-E-R-Y-L, Levine, L-E-V-I-N-E.

25         THE COURT:  Good afternoon.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1        MS. LEVINE:  Good afternoon.

2        THE COURT:  You heard all of this discussion.  Could

3   you just illuminate me on what discussions were had with

4   Nacirema between you and Nacirema's principals or attorneys.

5        MS. LEVINE:  The only contacts I had with employees or

6   principals of Nacirema was the letter that I sent to them

7   saying that you are hereby directed not to employ Calvo until

8   the end of our investigation.

9        THE COURT:  Okay.

10        MS. LEVINE:  I did have conversation with Ron Tobia,

11   who is the lawyer and integrity monitor for Nacirema.

12   Subsequently to my sending of that letter he called me and said

13   we are terminating Calvo; and I said thank you for notifying

14   me, can you please send me something in writing.

15        THE COURT:  Confirmation?

16        MS. LEVINE:  Right, about that, which he did.

17        THE COURT:  Did you have any discussion about whether

18   anybody at Nacirema or the company should assist this defendant

19   with his bail?

20        MS. LEVINE:  The issue of bail was not raised at all

21   during that conversation.

22        THE COURT:  Or at any other time?

23        MS. LEVINE:  At any other time.  That was the only

24   conversation I had prior to our receiving the order to show

25   cause from your Honor.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1        THE COURT:  And after that?

2        MS. LEVINE:  Subsequent to that Mr. Tobia did call me

3    again when he heard about this proceeding, and he was very

4    animated in that conversation, and he was saying --

5        MS. DANIEL:  Can we have a date on that?

6        THE COURT:  Well, it wasn't that long ago.

7        MS. LEVINE:  It was yesterday.

8        THE COURT:  Go ahead.  He was animated.

9        MS. LEVINE:  He was animated and he said that he's the

10   integrity monitor, and of course once the indictment came down

11   that they were going to terminate Calvo and of course they

12   weren't going to put up his bail, and that was solely his

13   decision.

14       THE COURT:  Not to put up the bail?

15       MS. LEVINE:  Exactly.  And the only direct question --

16   I didn't interrupt him.  He was very animated.

17       The only question I put to him directly was:  Was your

18   decision about bail, did it have anything to do with any

19   representations by the Business Integrity Commission, and he

20   said absolutely not.

21       THE COURT:  Who selects the integrity monitor?

22       MS. LEVINE:  Actually, the first time I heard that

23   Nacirema had an integrity monitor was the very first phone call

24   that Mr. Tobia made to me.  He said that it's a voluntary

25   program that they developed on their own.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1          THE COURT:  Who is "they"?

2          MS. LEVINE:  There are times where the commission does

3    impose as a condition of a license that the company take on a

4    monitor.  This is not one of those cases.

5          THE COURT:  So they took -- they retained, meaning

6    Nacirema retained, the integrity monitor on its own is your

7    understanding.

8          MS. LEVINE:  That's my understanding, yes.

9          THE COURT:  Okay.  All right.  Well -- yes?

10         MS. DANIEL:  If I can add, it's clear to me at this

11   point Nacirema is not going to put up the bail.

12         THE COURT:  Yes, I understand that, but my concern is

13   that there shouldn't be activity going on --

14         MS. DANIEL:  Absolutely.

15         THE COURT:  -- around town influencing whether

16   individuals should be providing bail or not providing bail.

17   The only issue about bail should be here in the courthouse.

18         MS. DANIEL:  I agree, your Honor.

19         THE COURT:  And that's really a message that I'm

20   trying to send to everybody, that we not have a substratum of

21   activity in a case such as this; and it could come up again in

22   this case or some other case where there is an accusation or an

23   actuality of a government agency somehow interfering in the

24   ability of a defendant in securing his bail or her bail.

25   That's really where I am.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

31

1    And what I'm hearing from the chair of the commission

2 is that no such thing happened in the case of the Business

3 Integrity Commission.  I take him at his word.

4    And I just want the message to be spread throughout

5 the land that this is the type of issue that concerns the Court

6 and that going forward there should be care taken in these

7 relationships, with regard to the subject of bail.  That's

8 really where I'm going here, and since it's the second time I

9 have heard something like this during my relatively brief

10 career here, I thought it was important to put a special, a

11 finer point on my concern.

12    So is there something else you would like to say?

13    MS. DANIEL:  Yes.  I mean I'm not saying that Nacirema

14 was ever told -- as a matter of fact, they started basically

15 ignoring our phone calls after Monday.  So I'm not saying they

16 were ever told not to post bond, but we are hearing that that

17 is something that could be considered in the licensing.  So I'm

18 sure Ron Tobia, who is someone who dealt with this, was

19 sufficiently nervous not to post the bail.

20    I can say unequivocally that they were going to assist

21 by providing sureties and providing money.  So I don't know

22 what the conversations were.  I take them at their word that

23 that was never said.

24    However, I think Nacirema was nervous enough

25 subjectively or objectively not to want to come forward.  They

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    were going to come forward prior to whatever context.  Maybe

2    it's reasonable, maybe it's not reasonable.

3              THE COURT:  How long did your client work for

4    Nacirema?

5              THE DEFENDANT:  Seven years.

6              MS. DANIEL:  They initially were very helpful.  I

7    spoke to Mr. Davis five times on the day of the arraignment.  I

8    spoke to him probably a total of 12 times before Monday.  I

9    spoke to Mr. Tobia.

10             So again, I don't know what contacts were.  I only

11   know what I was told by this gentleman Anthony, that they were

12   backing out because they were too nervous.  I wouldn't ask them

13   because if they don't get their license I don't want to be

14   responsible.

15             THE COURT:  What you want is one thing.  What --

16             MS. DANIEL:  Conditions that he could satisfy.

17             THE COURT:  What the defendant needs is another thing.

18             I think it definitely has a chilling effect on the

19   potential suretor that the suretor is under the jurisdiction of

20   a government agency whose members are part of this prosecution.

21   I mean there is no question about it.  That doesn't make it

22   wrong or improper.  It just means that it does have a chilling

23   effect.

24             And all I'm saying, what I'm saying is that the Court

25   has to be mindful that it becomes much more difficult for

Proceedings

1  someone accused of a crime to get the help he needs or she

2  needs to make bail, if that kind of perceived pressure -- I'm

3  not even saying it's real, but it's perceived -- exists; and I

4  want to minimize it, if I can.

5       You have someone here who has worked for the same

6  company for seven years.  Now, whether or not he has broken the

7  law, that will be resolved at some later time; and my concern

8  is that he could sit in jail for a good, long time, in part

9  because of the perception that this commission, comprised in

10 large measure of people who, you know, have been involved in

11 the investigation that resulted in this prosecution, might take

12 an adverse view to that minimal kind of assistance that a

13 former employer or principal of a former employer might

14 provide.

15      It's not an easy situation.  It's clear that they are

16 not going to provide any assistance.

17      MS. DANIEL:  I wouldn't want to ask them for it.

18      THE COURT:  But I want everyone to understand that

19 there is the issue of this commission doing its job, and then

20 there is the issue of creating a set of conditions for bail

21 that are both reasonable and achievable; and I don't want any

22 interference.  My understanding from what I have heard today is

23 there hasn't been any active interference.  The existence of

24 this commission is what it is.

25      So this defendant is going to have to look elsewhere.

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1    I do believe what you say, that the representations to you

2    originally were that these folks were going to provide some --

3    were going to serve as suretors and that they got scared off

4    because of what they perceived as the potential adverse

5    inferences that could be drawn by this commission.  Well, you

6    know, you can't -- we don't live in a perfect world either, but

7    I am concerned about it.

8          MS. DANIEL:  Well, I think it's entirely reasonable

9    for them to respond that way, and that's why I wouldn't push it

10   with them.

11         I will note that the defendant at this time can now

12   not meet the bail conditions.  Obviously, he wasn't able to pay

13   for the private attorney.  I will assist him in any way I can,

14   if I stay on for the entire length of the case.

15         THE COURT:  Is there a reason why you wouldn't?

16         MS. DANIEL:  No.

17         THE COURT:  Oh, good.

18         MS. DANIEL:  I'm just sorry, your Honor.  But in any

19   event, he cannot meet these conditions.  I believe he would

20   have been able to meet the conditions had they assisted, but at

21   this time -- and I haven't really been working on it in the

22   last two days, Mr. Burke has; but there is no way to meet the

23   bail conditions that we know at this point that were set by the

24   Court, and again, I note that the government mentioned several

25   times that Nacirema should be coming up with something, and

Proceedings

1   that is obviously not a possibility at this time.

2              MR. BURLINGAME:  Again, that is absolutely incorrect,

3   and I urge the Court to check the record of Tuesday's hearing.

4              THE COURT:  Well, if there is anything about what's

5   been said represented today that you find to be in error, and

6   if there is anyone who would like to submit any kind of

7   statement under oath regarding it, you can certainly provide

8   that.

9              Otherwise, you know what the conditions that I have

10  set for bail are, and if you meet those conditions then the

11  defendant will be released on bail.

12             Does the government have anything else?

13             MR. BURLINGAME:  No, Judge.  Thank you.

14             THE COURT:  All right.

15             Anything else from you, ma'am?

16             MS. SASANOW:  No.  Thank you, your Honor.

17             MR. MANSFIELD:  No, your Honor.  Thank you.

18             THE COURT:  I would like to thank you for coming in,

19  sir.  Thank you, marshals.

20             (All parties began to exit.)

21             THE COURT:  Bring everybody back.  Everyone comes

22  back.

23             Look, this case is going to go on a long time.  I

24  don't want any kind of acrimony or recrimination, like the

25  recrimination I have just heard when I ended this status

Proceedings

1   conference.  You can have differences of opinion.  I don't mind

2   that.  Lawyers get up in front of me all the time and have

3   differences of opinion as to what was said, but I want to keep

4   this all on a very high plane.  All right.  And that's, you

5   know, I will listen to everything everyone has to say.

6        I will consider everything.  You may disagree on what

7   was said and you may disagree on what was said, but I would

8   like you to treat this entity, which is the Court, with the

9   kind of respect that it requires.  So don't bicker, try to get

10  along, all right.

11       MR. BURLINGAME:  Yes, Judge.

12       MS. DANIEL:  Yes, sir.

13       THE COURT:  And please don't make comments in front of

14  me that I overhear that aren't on the record that upset me

15  because there is a lot of real issues to deal with.  And I

16  really think that you ought to bury the hatchet, not in each

17  other, and move forward.

18       I'm very concerned about everything that I have spoken

19  about.  That's the only reason I brought you here today, and I

20  would like -- and I'm sending the message that I think is

21  appropriate to send about how we should move forward.  But I

22  don't want you to -- I don't want this to descend into a

23  shouting contest of sorts, and I just -- I want the tone to be

24  positive.

25       MS. DANIEL:  Your Honor, I would like to order the

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York

Proceedings

1  transcripts from Monday's bail hearing and from Tuesday's as
2  well, with the Court's permission.

3       I will note that Mr. Burlingame just called me a liar
4  because I said that he asked why Nacirema was not a surety.

5       THE COURT:  I was trying to --

6       MS. DANIEL:  I would like to put that on the record.
7  So I would like to order the transcript, if the Court will.

8       THE COURT:  I was trying not to put that on the
9  record.  I was trying to move on from there.

10      MS. DANIEL:  Well --

11      THE COURT:  All right.  It's not going to matter
12  whether he called you something or you called him something.
13  That's not going to advance this discussion at all.

14      MS. DANIEL:  I have no desire to engage in that.

15      THE COURT:  I want to send a message to everybody that
16  I'm not going to sanction it, okay, and it's more important
17  coming from me than coming from you, frankly.

18      MS. DANIEL:  Anyway, if I may have permission to order
19  the transcripts.

20      THE COURT:  Because you all have to deal with me.

21      MR. BURLINGAME:  Of course, Judge.  The government's
22  word is very important to it, and I was upset that my word had
23  been maligned on the record and I got upset.  I apologize to
24  the Court for that and --

25      THE COURT:  I understand.  Nothing else more need be

Proceedings

38

1    said.

2            It's so ordered that you have the transcript of the

3    last hearing and this one.

4            MS. DANIEL:  Yes.  I would like Tuesday, and Monday

5    before Judge Bloom.

6            THE COURT:  You want Judge Bloom too?  We already have

7    Judge Bloom.

8            MS. DANIEL:  I don't.

9            THE COURT:  I have Judge Bloom.  You can have Judge

10   Bloom, you can have the last one, you can this one, CJA.  Okay.

11           MS. DANIEL:  Thank you, your Honor.

12           THE COURT:  Have a nice day, everybody.

13           (End of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, Official Court Reporter
United States District Court, Eastern District of New York