

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

```
JL:RB:EMN                          271 Cadman Plaza East
F. #2007R00730                     Brooklyn, New York 11201
```

August 3, 2008

BY ECF & Hand Delivery

The Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Joseph Agate, et al.
          Criminal Docket No. 08-76 (JBW)

Dear Judge Weinstein:

      The government writes regarding the sentencings
scheduled to take place in the above-referenced case beginning on
August 4, 2008.  In this submission, the government addresses
issues common to many defendants, and related issues pertaining
to certain defendants – for example, the applicability of a role
enhancement based on a certain defendant's participation in crime
with other defendants.  With respect to issues that only concern
particular defendants — for example, pleas for leniency based on
family circumstances or health concerns — the government will
address such issues orally at sentencing or, where necessary, by
separate written submission.

      For organizational purposes, this submission is divided
into sections covering: (1) the defendants who extorted the
individual identified in the indictment as John Doe #4, or pled
to crimes related to such extortions; (2) the loansharking
defendants; and (3) the gambling defendants.  In each section,
the government reviews the relevant facts concerning the crimes
committed by the identified defendants, including facts set forth
in the Presentence Investigation Reports ("PSR") the Probation
Department has completed to date, and then assess the sentencing
issues relating to those defendants.[1]

---

    [1]  For the defendants originally scheduled to be sentenced
pursuant to the Court's July 11, 2008 Order, the government has
received sentencing submissions and/or objections to the PSR from
defendants Vincent Amarante, Frank Cali, Joseph Casiere, Mario

I.   The John Doe #4 Extortions and Related Crimes

   A.   Factual Background

      1.   John Doe #4's History with the Gambino Family

         Before examining the various ways in which members and associates of the Gambino organized crime family (the "Gambino family") extorted John Doe #4, this section provides a broad outline of John Doe #4's long, varied and complex relationship with the Gambino family.

         John Doe #4 was born in Brooklyn in 1964 and moved to Staten Island in the early 1970's.  His father was a bookmaker, for whom John Doe #4 worked periodically while growing up.  In his early twenties, John Doe #4 began dealing drugs.  He was arrested in New Jersey in 1987 for selling cocaine, and in 1989 began serving a three-year sentence at Northern State prison.

         Just prior to his arrest, John Doe #4's father, who had by that point become one of the largest bookmakers in Staten Island, came under the control of defendant Jerome Brancato, a Gambino family soldier.  Specifically, Brancato assisted one of John Doe #4's employees in collecting a gambling debt owed by an associate of organized crime.  From that point forward, Brancato demanded, and John Doe #4's father paid, $1,000 a month in "protection" money.  Brancato's protection — also known as "servicing" — consisted of Brancato offering to mediate any disputes that might arise with members of organized crime, collect money owed by members of organized crime, and prevent other members of organized crime from also demanding protection money.

         Shortly into John Doe #4's prison sentence, his father told him that Brancato said that John Doe #4 should seek out Gambino family associate Sam Corsaro, who was also incarcerated at Northern State prison.  John Doe #4 did so, and Corsaro, who

_____

Cassarino, John D'Amico, Cody Farrell, Ernest Grillo, Steven Iaria, Anthony O'Donnell, John Pisano, Giulio Pomponio, Jerry Romano, Stephen Sabella, Anthony Scibelli, Frank Vassallo and Arthur Zagari.  To date, defendants Jerome Brancato, Sarah Dauria, Richard G. Gotti, Vincent Gotti, John Kasgorgis, William Kilgannon, Anthony Licata, James Outerie, Vincent Pacelli, Richard Ranieri, William Scotto, Edward Sobol and Tara Vega have sought and/or been granted adjournments of their sentencings to a date after August 11, 2008.

was near the end of a lengthy sentence, befriended John Doe #4 and helped him in prison.

Upon his release from prison, John Doe #4 moved to New Jersey to join Corsaro, who had by that point become a soldier in the Gambino family. Over the next few years, John Doe #4 served as an associate in the same Gambino family crew as Corsaro, engaging in criminal conduct that included loan sharking, illegal gambling and fraud. In 1996, John Doe #4 pled guilty to a federal indictment charging extortionate extension of credit and received a 36-month sentence, the majority of which he served at the federal correctional institution in Fort Dix, New Jersey.

While at Fort Dix, John Doe #4 shared a room for approximately one year with defendant Nicholas Corozzo, a powerful Gambino family captain who had served on the family's ruling panel in the early 1990s, and who many believed was slated to become boss of the family. Corozzo became friendly with John Doe #4 and told him that he would take John Doe #4 into his crew when he finished serving his sentence. During their time together at Fort Dix, Corozzo repeatedly instructed John Doe #4 to avoid further criminal activity and keep a low profile following his release from prison.

John Doe #4 finished serving his federal sentence in December 1999. Upon his release, he began working to grow a trucking company that he started just prior to his incarceration with defendant Joseph Spinatto, a Gambino family associate under defendant Thomas Cacciopoli, a Gambino family captain. While John Doe #4 was incarcerated, Cacciopoli had collected a debt for the trucking business and, as such, the business was now "with" Cacciopoli. As detailed below, this meant that among other things, each month John Doe #4 and his partner paid Cacciopoli protection money.

While John Doe #4's trucking company was under Cacciopoli's control, John Doe #4 himself remained under Corsaro. Soon after John Doe #4's release from prison, however, Corsaro died and defendant Louis Filippelli, a Gambino family soldier, who had taken responsibility for many of the family's construction rackets, assumed control of John Doe #4. Filippelli used his position to obtain "Christmas money" from John Doe #4 – tribute payments (in this instance, of $5,000) paid each year at Christmas -- and to exact further payments from John Doe #4 for any money he generated that was not associated with the trucking company (which, as above, was already controlled by Cacciopoli).

In the years following his release from prison, John Doe #4 and his partner developed their trucking business into one of the largest in New York.  Along the way, they engaged in two forms of illegal activity: (1) "double breasting," or defrauding union pension funds by failing to pay union scale to truckers in their employ working non-union jobs, and (2) defrauding the City of New York by performing work on jobs contracted to local business enterprises knowing that the local business enterprises served solely as fronts used to obtain the work.  In operating their trucking company, John Doe #4 and Spinatto received certain assistance from the Gambino family pertaining to their union, Teamsters Local 282, which the Gambino family previously controlled.  Specifically, John Doe #4 was allowed to create a union company and work both union and non-union jobs.  Further, during the period when John Doe #4 was incarcerated, the company received significant amounts of work from Metropolitan Stone, a business controlled by Gambino family captain Michael DiLeonardo.

As set forth in greater detail below, in late 2003 and early 2004, John Doe #4 and his partner, knowing that the Gambino family controlled the production of cement in Staten Island and that any attempt to start a cement company without Gambino family approval would be met with violent retribution, sought Cacciopoli and Filippelli's assistance in obtaining the Gambino family's permission to open such a plant.  Eventually, permission was granted on the condition that, following a short grace period, they make a protection payment each month.

Also during the period following his release from prison, John Doe #4 began dealing cocaine again.  In January 2005, John Doe #4 was arrested in possession of approximately one-half kilogram of cocaine.  Following his arrest, he agreed to cooperate with law enforcement, which, for the next three years, consisted primarily of making recordings of his conversations with members and associates of organized crime, as well as other individuals believed to be engaged in illegal activity.

In late June 2005, Nicholas Corozzo, who was recently released from prison, instructed defendant Mario Cassarino, a soldier in Corozzo's crew, to bring John Doe #4 to meet with Corozzo.  At the meeting, Corozzo informed John Doe #4 that he would now be "under" Corozzo, not Filippelli, and that since Corozzo was on supervised release and could not openly consort with convicted felons, John Doe #4 would be "handled" by defendant Leonard DiMaria, another Gambino family captain and Corozzo's longtime criminal partner.  At this meeting, Corozzo instructed John Doe #4 to keep a low profile, not do anything

illegal, make a lot of money, and keep DiMaria informed of exactly what he was doing at all times.

In the ensuing three years, DiMaria and Corozzo repeated this message to John Doe #4 time and again, emphasizing that he should not risk his earning potential by involving himself in illegal activity.  John Doe #4 followed their instructions, working to build his existing trucking and concrete businesses, and starting a number of new ventures in the construction field.  As discussed below, for every business he ran, DiMaria and Corozzo demanded, John Doe #4 provided and various members of the Gambino family collected, substantial extortion payments.  In each instance, while DiMaria and various other Gambino family members suggested that they could add value to these businesses through the Gambino family's connections in the construction industry, the promises were never fulfilled. John Doe #4 paid all the money demanded of him by the Gambino family.  But with the exception of the advantages gained by his trucking company noted above, he received nothing in return – no new business, no protection from competition, no debt collection.

The reality of John Doe #4's supposed "partnerships" with the Gambino family are laid bare by the words of defendant Vincent Dragonetti, a Gambino family soldier and the son-in-law of Nicholas Corozzo.  In the exchange below, Dragonetti and John Doe #4 are captured discussing the fact that Mario Cassarino, another soldier in Corozzo's crew and the owner of an excavation business, was upset that Corozzo had instructed John Doe #4 to start a competing excavation business.

> Dragonetti:  Mario, I seen Mario last week. "Everyone's in the business."  This, I says, "Mario, let me ask you a question. I mean, you're so fucking dumb," I says, "Take it from me," I says, "My business, my last [u/i], this and that.  Do you know the last time somebody gave me a job?  One of our friends?  Never! Never!"
>
> John Doe #4:  Never.  That's right.
>
> Dragonetti:  I says, "You dumb fuck.  What are you worried about what everyone else is doing?  I don't understand that.  Why do you give a fuck?  Go get your work.  No one's giving you nothing.  Remember that.  Nothing."

John Doe #4:    Nothing.

Dragonetti:    Nothing.

Later, DiMaria, who handled John Doe #4 for Corozzo, joined the conversation and Dragonetti revisited the point, with DiMaria and John Doe #4 voicing their agreement.

Dragonetti:    You know when the last time somebody gave me a landscaping job?  A friend of ours?

John Doe #4:    You gotta get it yourself.

DiMaria:    A thousand years ago.

Dragonetti:    Never!

DiMaria:    Never.  I know.

Dragonetti:    We don't have the work, nothing. Because I was talking to Mario, Mario who, two weeks he's selling everything, he's this and that, he's got no work, everybody's in the same business.  I says Mario, "Let me ask you a question. What the fuck you worried about everybody else for?"  I says, "If you do that, you're never gonna get nowhere. You know when the last time someone gave me a landscaping job?  Never!"

DiMaria:    You gotta go get it.

Dragonetti:    I says, "So, if I gotta wait on our friends to get a job, you gotta be crazy."

DiMaria:    There's a lot of work out there.

Dragonetti:    There's so much work out there, legitimately, you don't have to worry about nothing.

The point is simple: while John Doe #4 spent the first half of the 1990s operating as a typical Gambino family associate -- committing crimes for or with the backing of his Gambino family superiors -- following his release from prison in 2000,

his relationship to the family radically changed.  While he
benefitted from the Gambino family's control of the union in
growing his trucking business as detailed above, in his other
ventures, he conducted himself like any legitimate businessman,
and the Gambino family did nothing for him but take his money.
And like any other legitimate businessman extorted by the mob, he
paid the money asked of him for fear of the consequences if he
did not.

Indeed, because of his long association with the
Gambino family, John Doe #4 was particularly cognizant of the
Gambino family's rules and of the penalties for breaking them.
He knew, for example, that he could not "opt out" of his
relationship with the Gambino family, but would remain under one
member or another for the remainder of his days.  He knew that he
was expected to follow the orders given to him and pay the
amounts demanded of him.  And he knew that were he to refuse such
demands -- were he to say to Corozzo, DiMaria or any of the
others he interacted with that he had decided he would strike out
on his own and that he did not want Gambino family "protection"
or Gambino family "services" -- he would not be allowed to freely
leave.  He knew that the Gambino family prospers because its
demands are backed with violence -- that the demands mean
something -- and that if he were to disobey the orders given to
him, his disobedience would be met with violence.

2.   The Extortions

With this background, the following sections provide a
description of the extortions of John Doe #4 to which the
defendants pled guilty.

a.   Trucking

As noted briefly above, in the mid-1990's, John Doe #4
and defendant Joseph Spinatto formed a trucking company.[2]
Following the company's formation, while John Doe #4 was
incarcerated, defendant Thomas Cacciopoli, a Gambino family
captain, a recovered a debt owed to the company and, in return,
demanded monthly extortion payments from that point forward.

---

[2]   Spinatto pled guilty to mail fraud conspiracy stemming
from his and John Doe #4's failure to pay union wages to certain
employees in violation of their collective bargaining agreement
with Teamsters Local 282.

In 1999, John Doe #4 was released from prison and began making extortion payments to Cacciopoli. From that time until the arrests in this case, he and his partner paid more than $160,000 to Cacciopoli in extortion payments related to the trucking business. John Doe #4 made these payments directly to Cacciopoli and to defendant Joseph Scopo, a Gambino family soldier under Cacciopoli's control, who collected the payments on Cacciopoli's behalf on numerous occasions. In addition, defendant Robert Epifania, a Gambino family soldier, on multiple occasions relayed instructions from Cacciopoli to John Doe #4 concerning the extortion of John Doe #4.

John Doe #4 maintained cordial relations with both Cacciopoli and Scopo throughout the course of the extortion. As detailed above, the Gambino family's control over the union permitted John Doe #4 and his partner to engage in fraud on the union through double-breasting, and Gambino family captain Michael DiLeonardo provided the company with significant amounts of work in the late 1990s. However, John Doe #4 did not contract for this assistance or ask for the mob "protection" his company received. Rather, because his partner turned to Cacciopoli to help collect a debt while John Doe #4 was in prison, he was bound to the Gambino family, and to pay Cacciopoli, for as long as the company stayed in business. In this instance, that amounted to more than 10 years.

John Doe #4 acceded to this arrangement because he knew of Cacciopoli's leadership position in the Gambino family, and understood that he could not escape the arrangement Cacciopoli imposed on him. From personal experience, John Doe #4 knew the way the Gambino family worked, and thus realized that to the Gambino family, he "legitimately" owed them the money he paid because Cacciopoli had long ago used the Gambino family name to collect a debt -- a "service" Cacciopoli was then able to provide because Spinatto knew that even the organized crime members from whom Cacciopoli recovered the debt would recognize that a Gambino family demand for money would be enforced.

Because John Doe #4 never resisted Cacciopoli's demands, the implied threat inherent in a Gambino family demand for money was never realized. Throughout, however, John Doe #4 knew precisely who he was dealing with, and that if he defied Cacciopoli's orders the Gambino family would take whatever steps were necessary, including violence, to enforce its will.

b. Staten Island Cement Company Profits and Sale

In late December 2003, John Doe #4 and Spinatto decided

that they would like to open a cement plant in Staten Island.  At the time, John Doe #4 knew that the Gambino family maintained tight control over the production of cement in New York City and that any attempt to open a cement plant in Staten Island without the blessing of the Gambino family administration would be dealt with harshly, through violence.  As such, John Doe #4 and his partner asked defendants Thomas Cacciopoli and Louis Filippelli, both Gambino family captains, to help them obtain the necessary permission.

Following a series of meetings with the Gambino family administration, Cacciopoli and Filippelli secured permission for John Doe #4 to open the plant on the condition that he make monthly payments.  Initially, the Gambino family demanded 15% of the plant's profits, but the demand later changed to $1 for every yard of concrete produced -- an arrangement designed to ensure that the Gambino family made money as long as the plant operated, regardless of its profitability.  Filippelli and Cacciopoli advised John Doe #4 that the Gambino family would allow the plant some time to establish itself prior to collecting the payments.  With that, in late spring 2004, John Doe #4 and his partner began taking the steps necessary to open the plant.

The Gambino family started collecting its protection payments in May 2005.  As of the arrests in this case, John Doe #4 paid more than $60,000 to various members of the Gambino family.  The initial payments were collected by defendant Vincent Pacelli, a Gambino family soldier, on behalf of the then incarcerated Filippelli.  After defendant Nicholas Corozzo, a Gambino family captain, assumed control of John Doe #4 in late June 2005, payments were collected on his behalf for the administration by defendant Leonard DiMaria, another Gambino family captain, who controlled John Doe #4 for Corozzo while Corozzo was on supervised release, as well as by defendants Mario Cassarino and Ernest Grillo, both Gambino family soldiers.

During the spring of 2007, a large, publicly traded company free of ties to organize crime offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Corozzo and DiMaria to consult them before making any decisions concerning his business, John Doe #4 informed DiMaria of the offer.  DiMaria told John Doe #4 that he would need to check with his superiors, after which he instructed John Doe #4 to make the sale and pay $100,000 of the proceeds to the Gambino family administration.

In January 2008, John Doe #4 sold his Staten Island cement company.  Thereafter, defendant Joseph Corozzo, the

Gambino family consigliere, through defendant Augustus Sclafani, a Gambino family acting captain, directed John Doe #4 to deliver the $100,000 to Sclafani, who said that he would in turn give it directly to Joseph Corozzo.  Later, Nicholas Corozzo and DiMaria directed John Doe #4 to deliver the money to DiMaria for distribution to the administration, and Corozzo excoriated John Doe #4 for meeting with Sclafani without his permission.  In late January 2008, at Corozzo and DiMaria's direction, John Doe #4 made the initial payment of the cement plant sale proceeds to DiMaria.  One week later, the defendants were arrested.

Multiple members of the Gambino family informed John Doe #4 that the profits from his Staten Island cement company were passed along to the Gambino family administration, and that the administration consisted of defendants John D'Amico, Domenico Cefalu and Joseph Corozzo, the acting boss, acting underboss and consigliere, respectively.  All three administration members pled guilty to this extortion.

As above, John Doe #4 did not volunteer to pay his money to the Gambino family.  He did not contract or partner with the Gambino family.  Rather, he and his partner simply wished to open a business.  Their knowledge of organized crime and the construction industry made them fully aware of the fact that the Gambino family would destroy their company if they were to attempt to open it without the family's blessing.  Further, because of this knowledge, had they attempted to brazenly open the business without permission, John Doe #4 understood that they would open themselves up to the specter of Gambino family violence for willfully flouting its authority.  John Doe #4 and his partner thus sought from the Gambino family the permission necessary to exercise a fundamental American right -- to pursue property by starting a business.  Again, that permission was all that they received.  The Gambino family did not assist the business in any way -- no work was directed to the plant, no money was invested, no members or associates pitched in their labor.  John Doe #4 paid more than $60,000 for the Gambino family's blessing to open a business.  Another $100,000 was demanded for the right to sell.  John Doe #4 agreed to these demands because he knew who he was dealing with, and knew that if he refused, there would be violent repercussions.

In a related extortion, in early January 2008, defendant Joseph Scopo, a Gambino family soldier, approached John Doe #4 on behalf of Cacciopoli and instructed him that when the sale of his cement company took place, John Doe #4 should not provide his partner with the more than $300,000 in sale proceeds due to him.  Instead, Scopo told John Doe #4 that either

Cacciopoli would collect the money when he was released from prison, or Scopo would collect the money himself to later be delivered to Cacciopoli.

c. <u>Pump Truck</u>

In June 2005, John Doe #4 sought permission from Gambino family captain Leonard DiMaria, who exercised day to day control over John Doe #4 for Gambino family captain Nicholas Corozzo, to purchase a cement pump truck and open a business. Later, DiMaria allowed John Doe #4 to start the business on the condition that John Doe #4 provide them with 60% of the pump truck's profits.  The pump truck business operated for a time, but was not profitable.  As such, John Doe #4 did not make payments to Corozzo and DiMaria according to the terms imposed on him.

Like his other dealings, John Doe #4 felt compelled to accept the terms dictated to him by the Gambino family -- paying money to Corozzo and DiMaria in return for nothing more than their blessing to proceed with the business -- because he knew that he could not disobey the orders of the powerful Gambino family captains without facing violent retribution to his person or property.

d. <u>The Construction List</u>

In July 2005, defendant Leonard DiMaria, a Gambino family captain, instructed John Doe #4 to help defendant Ernest Grillo, a Gambino family soldier, reinitiate collections from construction companies that had been making extortion payments to jailed Gambino family soldier Edward Garafola prior to his incarceration.  Garafola, who had been a member of the Gambino family's "construction panel," a body which oversees the Gambino family's construction rackets, had exacted extortionate payments from scores of construction companies prior to his incarceration, but had not shared the identity of all those companies with his Gambino family superiors.

John Doe #4 contacted Grillo as instructed.  Together, Grillo, John Doe #4, defendant Angelo Ruggiero, a Gambino family soldier, and defendant Anthony O'Donnell, a Gambino family associate, who had served as Garafola's right hand in conducting the extortions (and who had accompanied Garafola on at least one occasion while Garafola assaulted a contractor who was late in his payments), repeatedly met to reconstruct a list of the contractors who had been paying Garafola extortion and to plot the reinitiation of collections.  Under the supervision and at

the direction of defendant Nicholas Corozzo, a Gambino family
captain, and DiMaria, the four men created a list of more than 40
construction companies and individual contractors that formerly
made extortion payments to Garafola.  Grillo, Ruggiero and
O'Donnell then approached a number of the companies and informed
them that they were back under Gambino family control and would
need to begin making protection payments again.  In one instance
in which John Doe #4 accompanied Grillo on such a visit to a
plumber on the list, Grillo told John Doe #4 that, at the very
least, they would "get Christmas money from him."

During the period in which Grillo and the others were
reconstructing the list and approaching its members, Edward
Garafola's son asserted his father's right to the extortion
victims.  In response, Grillo told John Doe #4 that he assaulted
Garafola's son – "I choked him out."

Because John Doe #4 was not involved in collecting the
renewed extortion payments from the contractors identified on the
list, and the victims' were uniformly reluctant to speak with law
enforcement due to their fear of Gambino family retribution, the
amount of money successfully extorted from the individuals placed
on the construction list is unknown.  John Doe #4 did, however,
witness the transfer of money collected from a member of the list
to Grillo on one occasion.

e.   The Proposed NASCAR Site

In January 2006, a subsidiary of International Speedway
Corporation had begun working to develop a large property in
Staten Island for the construction of a NASCAR racing oval (the
"NASCAR site").  Developing the site involved trucking in
millions of cubic yards of fill, a job for which John Doe #4's
large trucking business was well suited.

As such, defendants Ernest Grillo, a Gambino family
soldier, Domenico Cefalu, the Gambino family's acting underboss,
Leonard DiMaria, a Gambino family captain, Vincent Dragonetti, a
Gambino family soldier, Nicholas Corozzo, a Gambino family
captain, and Frank Cali, a Gambino family captain, together
informed John Doe #4 that he would be required to pay money to
the Gambino family for any work that he received at the NASCAR
site.  In spring 2006, John Doe #4 agreed to take the job, which
he earned without assistance from the Gambino family, despite the
need to pay the family protection payments.  The Gambino family
initially demanded that for every cubic yard of fill John Doe #4
dumped at the site, he would pay $1 to be split between Corozzo,
DiMaria, Cefalu and Cali.  Eventually, Corozzo and DiMaria cut

Cefalu and Cali out, and they split the dollar per yard dumped that John Doe #4 paid among themselves.

John Doe #4 worked at the site for a short time before it was closed and paid approximately $13,000 to defendant Mario Cassarino, a Gambino family soldier, who collected the money for Corozzo and DiMaria.

As above, John Doe #4 did not wish to pay money to the Gambino family for a job he obtained and performed on his own. He realized, however, that he could not refuse Gambino family demands for money without suffering harsh retribution, including the threat of violence.

### f.   Excavation

In approximately January 2006, Gambino family captain Nicholas Corozzo instructed John Doe #4 to start an excavation business which, after a short period in which John Doe #4 would be allowed to operate the business without making protection payments, would be required to pay 60% of its profits to Corozzo, Gambino family soldier Vincent Dragonetti and Gambino family captain Leonard DiMaria.  John Doe #4 did as he was told, and began making these payments a few months after starting the business.  From that time until DiMaria and Dragonetti were arrested and Corozzo took flight, John Doe #4 paid more than $30,000 in extortion payments related to the excavation business to DiMaria and Dragonetti, who collected the payments on Corozzo's behalf.

In keeping with the pattern detailed above, John Doe #4 paid for the excavator, solicited business and performed the work without assistance from Corozzo, DiMaria, Dragonetti or any other Gambino family member or associate.  Once again, Corozzo "earned" the money paid to him solely by dint of his control of John Doe #4.  And as before, John Doe #4 did not agree to this extortion because he enjoyed paying money to those who did not earn it, but because he knew he could not disobey a direct order from his Gambino family superiors without becoming the victim of serious reprisals.

### g.   Liberty View Harbor Construction Site

In April 2006, defendants Nicholas Corozzo, a Gambino family captain, and Vincent Dragonetti, a Gambino family soldier and Corozzo's son-in-law, directed John Doe #4 to open a portable cement plant at the Liberty View Harbor construction site in Jersey City, New Jersey.  VMS Construction, a company owned by defendant Anthony Scibelli, a Gambino family associate controlled

by Dragonetti, served as general contractor at the site.   In addition to the portable cement plant, John Doe #4's excavation business and pump truck also performed work at the Liberty View Harbor site.

Under the terms dictated to him by Corozzo, Dragonetti and defendant Leonard DiMaria, a Gambino family captain, John Doe #4 was to pay the Gambino family 60% of his profits for any work performed at the Liberty View Harbor site.   In addition, Scibelli and Dragonetti demanded that John Doe #4 pay an additional $6 to $7 for each yard of cement produced by his plant, as well as extortionate payments relating to the other two businesses.

Over the course of the extortion, John Doe #4 made extortion payments to the Gambino family of more than $200,000.

Despite these payments, during the summer of 2007, with the backing of Corozzo, DiMaria and Dragonetti, Scibelli took possession of the portable cement plant without remuneration to John Doe #4.

In October 2007, following Scibelli's takeover of his portable cement plant, DiMaria and Corozzo directed John Doe #4 to supply his former plant with the powder it would need to make cement, and to provide 60% of his profits relating to the cement powder deliveries to be split between Corozzo, DiMaria and Dragonetti.   As directed, from that period through the arrests, John Doe #4 paid $6,000 in extortion related to the cement powder.

As above, John Doe #4 was in no sense partners with Corozzo, DiMaria, Dragonetti and Scibelli.   He began working at the Liberty View Harbor site at the direction of his Gambino family handlers and split the profits with them (60% for the Gambino family to 40% for himself), but John Doe #4 paid for the plant, built it and operated it without any Gambino family assistance.   Under this arrangement, John Doe #4 not only paid more than $200,000 in extortion, but acquiesced when DiMaria informed him that he would have to abandon the plant for the good of the Gambino family.   As above, John Doe #4 ceded to these demands because he had no other option.   Were he to take the job and refuse to pay, or refuse a job that would have been so profitable for the Gambino family, John Doe #4 knew that the Gambino family would have retaliated against his insubordination with violence.

h.   <u>Jerome Brancato</u>

In July 2006, defendant Leonard DiMaria, a Gambino family captain, informed John Doe #4 that John Doe #4's father would need to once again start paying money to the commissary of defendant Jerome Brancato, a jailed Gambino family soldier.  As noted above, John Doe #4's father made protection payments of $1,000 a month to Brancato from the early 1990s through June 2005, when Corozzo told John Doe #4, "you and your father are with me."  At that point, the payments stopped.

At the end of 2006, when Brancato was released from prison, DiMaria again instructed John Doe #4 to have his father provide Brancato with money to help him get him back on his feet.  In response, John Doe #4 gave $2,500 to Gambino family soldier Vincent Dragonetti, who collected the money for Brancato.

In January 2008, defendant Nicholas Corozzo, a Gambino family captain, told John Doe #4 that Brancato had passed a message to him through defendant Joseph Chirico, a Gambino family solider, that his father failed to provide Brancato with Christmas money -- as noted above, a year-end tribute payment.  Corozzo instructed John Doe #4 to make sure that money from his father was given to Chirico, who would collect the money for Brancato.  The following day, John Doe #4 gave Chirico $1,500 for Brancato.

John Doe #4 did not wish to pay Brancato money on his father's behalf because Brancato had collected a debt for his father more than 15 years before, but he knew that when Corozzo and DiMaria supported Brancato's demand that his father make the payments, both he and his father would be placed in jeopardy were he to refuse.

i.   <u>Granite Halmar</u>

In November 2005, defendant Vincent Amarante, a soldier in the Bonanno organized crime family (the "Bonanno family") and defendant Steve Sabella, a Bonanno family associate, informed John Doe #4 that he needed to pay money to defendant Michael Urciuoli, another Bonanno family associate, because Urciuoli claimed that he had referred work to John Doe #4 from Granite Halmar, a construction company.  Following multiple requests for the money, defendant Mario Cassarino, a Gambino family soldier, successfully warded off Amarante, Sabella and Urciuoli.  As such, no money was paid.  Nevertheless, John Doe #4 was aware of the defendants' positions in the Bonanno family, and the Bonanno family's reputation for using violence to enforce its demands for

money.

### j.   The Cracolici Dispute

        In approximately January 2006, defendant Gino
Cracolici, a Gambino family associate, asserted that John Doe #4
owed him $70,000 in connection with certain trucking business.
John Doe #4 did not agree, so Cracolici turned to defendants
William Scotto and Anthony Licata, Gambino family soldiers, to
force John Doe #4 to pay the money.  Thereafter, Scotto and
Licata participated in meetings with other members of the Gambino
family to resolve the dispute in favor of Cracolici.  John Doe #4
eventually won the dispute, so he was not forced to pay the money
Cracolici demanded.  Implicit in the formalized "sitdown" the
Gambino family called to resolve the dispute, however, was the
fact that had John Doe #4 not prevailed, he would have been
required to pay or face Gambino family sanction from Cracolici's
representatives, Scotto and Licata.

### k.   Schiavone Construction

        In late 2004, defendant Nicholas Calvo, an associate of
the Genovese organized crime family, brokered a deal between John
Doe #4's trucking company and Schiavone Construction Company
through defendant Michael King, a project manager at Schiavone
and son of Schiavone executive Tom King.  Under the arrangement,
Michael King agreed to hire John Doe #4's trucking company to
perform the trucking on a number of large Schiavone capital
construction projects including New York City's Third Water
Tunnel and the Croton Water Filtration Plant.  In return, John
Doe #4 was to make payments to King and Calvo.  As of the date of
the arrests, John Doe #4 had paid over $130,000 to Calvo and King
under this arrangement.  John Doe #4 understood that if he did
not make these payments, he would lose the work.  Further, due to
Calvo's ties to organized crime, John Doe #4 knew that any money
demanded that was not paid would be collected by any means
necessary.

### B.   Argument

#### 1.   The Extortions Involved An
Implied Threat of Violence

        The defendants argue that a two-point enhancement
assessed in both the PSR for the use of an express or implied
threat of violence in carrying out the extortion of John Doe #4
should not apply.

Guidelines §2B3.2(b)(1) provides: "If the offense involved an express or implied threat of death, bodily injury, or kidnaping, increase by 2 levels."  The commentary to this section clarifies that "if the offense involved organized criminal activity, . . . an upward departure may be warranted."  U.S.S.G. § 2B3.2(b) note 8.

The defendants argue that while they pled guilty to extorting John Doe #4, the extortions were somehow victimless business arrangements, in which John Doe #4 reaped the benefits of Gambino family protection in the form of increased business or protection from competition.

The defendants' arguments are well-represented by the submission of John D'Amico, the Gambino family's acting boss. Despite his guilty plea, and the points subtracted from his guidelines total for acceptance of responsibility, D'Amico repeatedly denies his guilt.  He argues that the government's evidence against him is weak, that he did not get a penny from the extortions, and that John Doe #4 was not an extortion victim, but rather a business partner of the "enterprise" to which D'Amico belongs, an organization he also refers to as "the family."  (See D'Amico Sentencing Memorandum ("D'Amico Memo.") at 8.)  In a typical passage, D'Amico argues, "The evidence is simply overwhelming that the nature of the business relationship between Vollaro and the defendants . . . was an arrangement with a common purpose -- to enrich one another.  Not through violence or threats of violence but from a common effort to make the business profitable."  (Id. at 9.)

Due to this partnership with common goals and no threats of any kind -- i.e., because there was no extortion -- the defendants argue that John Doe #4 could rest assured that none of them -- despite their known status as members of a notoriously violent organized crime family -- would be willing to back up their demands for money with violence.  In support of their argument that no crime was committed, notwithstanding the dozens of guilty pleas, the defendants cite (1) their own self-serving accounts of the extortions, (2) John Doe #4's participation in the extortions, (3) John Doe #4's status as an associate of the Gambino family and his amicable relationships with certain of the defendants, and (4) various snippets of recorded conversations in which Gambino family members and associates discuss their plans to help John Doe #4, or their deep interest that John Doe #4 not make any payments that did not make financial sense for him.

The argument fails.  Before addressing the flaw in the

rationales behind the argument, it is useful to examine the basic facts which are not in dispute – facts which amply justify application of the contested enhancement.  First, while for the most part avoiding reference to the Gambino family, the defendants freely admit that each of their crimes stemmed from their participation in the enterprise that extorted John Doe #4.  And while many of the defendants avoid the words, the only enterprise here alleged is the Gambino family.  D'Amico's submission again makes the point:  "The defendants considered [John Doe #4] to be a long standing associate of the enterprise. . . . he was not a victim but an unapproachable associate of organized crime . . . [John Doe #4's] ability to communicate directly with captain Thomas Cacciapoli (sic) was testament to [John Doe #4's] economic value to the Gambino family."  (See D'Amico Memo. at 7-8.)  As such, the Gambino family's central role in the extortions is not doubt.

      Second, despite the defendants' best efforts to paint the Gambino family as a business association working with John Doe #4 as a valued and voluntary business partner, there can be no argument that the Gambino family possesses a well-known reputation for violence, earned through decades of violent activity.  Innumerable members of the Gambino family have been convicted of murders and other violent acts related to Gambino family business.  Indeed, the Gambino family's very initiation ceremony involves the recitation of an oath to commit violence, including murder, on the orders of the family's boss.

      Third, despite their current characterization of the facts, the defendants each swore under oath to extorting John Doe #4.  By its terms, an extortion under 18 U.S.C. § 1951(a) involves: (1) obtaining the property of another with the consent of that individual; (2) inducing the victim's consent by wrongfully using or threatening to use force, violence or fear; and (3) delaying, obstructing, or affecting in some way or degree interstate commerce, or an item moving in interstate commerce.  Because the defendants here pled guilty to this crime, each has acknowledged - at the very least - to wrongfully inducing John Doe #4 to provide money to the Gambino family out of fear.

      Fourth, the defendants uniformly admit that John Doe #4 was familiar with the Gambino family, and was considered to be a Gambino family associate at one time.  As such, it cannot be argued that John Doe #4 was unaware of the Gambino family's criminal nature, its aims and methods, including its comfort with the use of violence to enforce its members orders.

      These four undisputed facts - that the defendants each participated in the Gambino family, that the Gambino family has a

well-earned reputation of violence, that the defendants created
fear in John Doe #4 in order to carry out their extortion, and
that John Doe #4 was aware that he was being extorted by members
of the Gambino family - alone create the implied threat of
violence justifying the enhancement.

Given these facts, to successfully avoid the
enhancement, the defendants must argue that they calibrated their
actions to create just enough fear in John Doe #4 to effectuate
their extortion, but not so much that he would believe that they
might use their status as members of a violent criminal
organization to reach the same result.

The argument is untenable.  It is a fact now
highlighted by the defendants flight from acceptance of
responsibility.  Where at allocution, each defendant admitted
that John Doe #4 parted with his money out of fear, all now argue
that he parted with it by choice - in order to receive the
benefits of Gambino family protection and referrals.  But even if
such benefits were forthcoming and valuable (with the lone
exceptions noted above - they were not), the defendants' current
position simply cannot be squared with their guilty pleas.  John
Doe #4 could not both be partners with the defendants, freely
choosing to do business with the Gambino family for his own
economic benefit, and an extortion victim - parting with money
for fear of the consequences if he did not.  In other words, if
John Doe #4 were a partner, there could be no extortion because
he would have been parting with his money not out of fear, but by
choice.  If, on the other hand, as the defendants uniformly
attested under oath, they extorted John Doe #4, then they cannot
now argue that he was not a victim.

The defendants now take this position because it is
self-evident that if the extortion is called by its proper name,
with its victim identified as a victim, then the defendants are
left in the box identified above - their extortion victim knew
them to be members of a violent organization but that knowledge
did not play any part whatsoever in creating in him the fear that
caused him to give them money.  The defendants take this tact -
that there was no victim - because it is the only way to argue
that the Gambino family could have an extortion victim who felt
no fear of violence.  Unfortunately for the defendants, this
conflicts with their guilty pleas - there is no such thing as a
victimless extortion.  The defendants pled guilty to a serious
crime.  This Court should not now absolve them of it by allowing
them to reap the benefits of avoiding trial and pleading guilty
while simultaneously denying their guilt.

The incongruity of the defendants' position also is
shown by the uniform application of Section 2B3.2(b)(1) to

members of organized crime convicted of extortion where there is
no express threat of violence. <u>See</u> <u>United States v. Corrado</u>, 304
F.3d 593, 614-15 (6th Cir. 2002) (two-point enhancement under §
2B3.2(b)(1) appropriate absent overt threat based on defendant's
status as member of organized crime); <u>see also</u> <u>United States v.
Panaro</u>, 266 F.3d 939, 953-54 (9th Cir. 2001) (same); <u>United
States v. Zannino</u>, 895 F.2d 1, 11-12 (1st Cir. 1990) (same); <u>cf.
United States v. Lombardozzi</u>, 491 F.3d 61 (2d Cir. 2007)
(inference of an implied threat of violence or criminal harm
proper based on victim's knowledge of defendant's organized crime
connections); <u>United States v. Mulder</u>, 273 F.3d 91, 103-04 (2d
Cir. 2001) ("Bad reputation is relevant to the fear element in a
Hobbs Act conspiracy since such a reputation frequently conveys a
tacit threat of violence"); <u>United States v. Tropiano</u>, 418 F.2d
1069, 1081 (2d Cir. 1969) (same); <u>United States v. DiSalvo</u>, 34
F.3d 1204, 1213 (3d Cir. 1994) (upholding extortion conviction
where victim was familiar with defendant's organized crime ties
because jurors reasonably inferred an implied threat); <u>United
States v. Schweihs</u>, 971 F.2d 1302, 1317 (7th Cir. 1992)
(upholding district court's seven-point enhancement based on
defendant's ties to organized crime where district court found
organized crime status more harmful than discharging a firearm).

        In accord with these decisions, as well as basic common
sense, the most elemental facts of the case justify the
application of the disputed enhancement.  When members of one of
the most notoriously violent criminal organizations extort
someone, that person's fear necessarily encompasses the fear of
violence.

        We now turn to the various rationales the defendants
set forth to support their argument.  First, the defendants claim
that since they did not allocute to the use of violence in
extorting John Doe #4, the extortion did not involve an implied
threat of violence.  The point is inapposite.  The defendants
negotiated en masse for the right to challenge the enhancement
and the government reserved its right to oppose this challenge.
Given this, all the defendants' allocutions prove is that their
counsel adequately prepared them to plead guilty without
sabotaging an argument they reserved the right to later make.

        The defendants next argue that since John Doe #4 did
not resist their extortions, but willingly paid the money
demanded of him, he could not have felt threatened by the Gambino
family.  The argument defies both logic and the facts.  John Doe
#4 acquiesced to the Gambino family's demands precisely because
he knew that if he did not, he would face certain, violent
retribution.  The notion that John Doe #4 somehow conducted a

series of arm's length transactions with the top leadership of
the Gambino family which constituted extortion, but which were
extortions with no victim, from which John Doe #4 benefitted, is
nonsensical.  And it is worth noting that under the defendants'
theory of the case, the Gambino family benefitted the defendant
through its control of the various construction fields in which
John Doe #4 operated - control we are left to assume must have
been established through a series of friendly, mutually
beneficial extortions without victims, conducted by a violence-
free organized crime family.

Next, the defendants argue that since John Doe #4 was a
Gambino family associate, he could not have feared Gambino family
violence.  This again ignores the nature of the enterprise.
Numerous Gambino family cooperators have for decades uniformly
testified that the Gambino family enforces its discipline through
violence and that the punishment for not following the rules runs
anywhere from beatings to death.  Prior to their murder,
virtually all of the Gambino family members and associates killed
by the family had close associations within it - a fact
necessitated by its secret, cloistered nature.

Further, John Doe #4 was a not a typical associate.
While he started his Gambino family career in typical fashion,
committing crimes with and at the behest of his superiors to
increase the family's revenues, following his release from prison
and the success of his trucking business, he became something
wholly different.  John Doe #4 was now a businessman, continually
implored by his Gambino family handlers to avoid any sort of
illicit conduct.  The switch made sense as the growth of John Doe
#4's trucking business, and his ability to leverage that growth
into other business ventures, provided the Gambino family with an
enormous source of income.  And with this switch, John Doe #4
took on the profile of an archetypal organized crime victim - a
businessman making a series of monthly protection payments.  This
is the crime the defendants pled guilty to, it is the crime they
committed, and it is the crime for which they should be
sentenced.

Finally, the defendants point to a smattering of
decontextualized quotes taken from the approximately 900 hours of
conversations recorded by John Doe #4 in an attempt to show that
John Doe #4 was not the victim they pled guilty to extorting, but
the beneficiary of Gambino family largess, incapable of feeling
fear of even the most powerful of its members.  The overwhelming
majority of these quotes show one of the extortion defendants
assuring John Doe #4 that he will make an effort to find John Doe

#4's business work, or that he does not want John Doe #4 to make a certain payment if it is too onerous.

These statements - all uttered by defendants who (1) pled guilty to extorting John Doe #4, and (2) belong to a criminal organization that counts extortion among it primary revenue sources - cannot be taken at face value. In their proper context, such statements come quickly into focus as part and parcel of a successful extortion. First, to the extent possible, the extortioner wants the victim to believe there is something in the extortion for them. For example, the extortioner does not tell the bar owner to pay money to prevent the extortioner from vandalizing his bar, but tells him that he is paying for protection – a helping hand that will prevent the windows from being broken. Similarly, here, the extortioners phrased their demands in ways to make it appear that they were doing something other than simply taking John Doe #4's money for nothing.

Second, it is self-evident that any organization that thrives on extortions cannot exact such heavy payments from its victims that it destroys them financially. John Doe #4 became their goose that laid golden eggs for the Gambino family, and they were smart enough not to keep the goose alive. As such, discussions about attempts to refer business to John Doe #4 or to tell him that they did not wish to take more than he could afford simply show proficient extortioners practicing their craft. Further, if any referrals would have come through, additional business for John Doe #4 would only lead to greater extortion payments for the defendants.

But as defendant Vincent Dragonetti vehemently attested to with the robust assent of John Doe #4's primary handler, Gambino family captain Leonard DiMaria, the Gambino family did not actually provide business referrals, even to a member like Dragonetti.

> Dragonetti:   You know when the last time somebody gave me a landscaping job? A friend of ours?
>
> John Doe #4:   You gotta get it yourself.
>
> DiMaria:   A thousand years ago.
>
> Dragonetti:   Never!
>
> DiMaria:   Never.  I know.

Dragonetti:  We don't have the work, nothing.
        Because I was talking to Mario, Mario
        who, two weeks he's selling everything,
        he's this and that, he's got no work,
        everybody's in the same business.  I
        says Mario, "Let me ask you a question.
        What the fuck you worried about
        everybody else for?"  I says, "If you do
        that, you're never gonna get nowhere.
        You know when the last time someone gave
        me a landscaping job?  Never!"

Were the defendants' portrait of John Doe #4 as a man lifted to success by Gambino family referrals correct, the above exchange could not be possible.  Dragonetti would not repeatedly disparage fellow Gambino family soldier Mario Cassarino for hoping that the Gambino family would limit his competition and provide him with business, and DiMaria, Dragonetti and John Doe #4 would not scoff at the notion of the Gambino family providing a useful business referral.  Instead, this conversation provides stark insight into the reality of John Doe #4's true relationship with the Gambino family - he paid much and received virtually nothing.  The suggestion that the Gambino family was a source of business was openly mocked by senior members of the organization that now invokes this argument as its primary defense to the contested enhancement.  The Court should not allow them to escape just punishment by relying on an argument that so clearly collapses under its own weight.

Finally, many of the defendants point to an excerpt from a conversation between John Doe #4 and one of his handling agents to argue that (1) John Doe #4 could not face violent threat because he had been told he could become a member of the Gambino family, and (2) John Doe #4 expressly stated that Gambino family extortions were not violent affairs.  To begin, for the reasons detailed above concerning the Gambino family's use of violence to police itself, whether John Doe #4 was considered for membership or believed himself to be considered for membership is of no moment – regardless of his position, he would still be subject to violent retribution were he to disobey Gambino family rules or orders.  Second, in the portion of the conversation in which John Doe #4 says, "Listen, there ain't nobody hurting nobody no more these days," he was responding to a suggestion by law enforcement that he should offer to carry out violent extortions of contractors and other individuals not associated with the Gambino family in order to impress his Gambino family handlers.  In the quoted segment, John Doe #4 explains to the agent that to his understanding, the Gambino family would not

want him to take bold action against individuals with no
association with the Gambino family for fear that those
individuals approached might turn to law enforcement.  Never was
it suggested, nor did John Doe #4 believe, that he could
willfully disregard instructions from Gambino family members
without inviting a violent response.  Indeed, based on
conversations he recorded, he knew full well of the Gambino
family's capacity for violence.

         For example, on November 9, 2005, approximately one
month prior to the above-quoted conversation with the agent, John
Doe #4 recorded a conversation with Gambino family captain
Leonard DiMaria, John Doe #4's immediate handler.  In that
conversation, DiMaria repeatedly referred to using violence in
dealing with organized crime associates he believed to have
violated proper protocol, stating that he would "smash heads" and
"grab a couple of them and make them shit."

         That recording is far from aberrant as, despite the
Gambino family members' best efforts to speak in code, their
capacity for using violence to carry out Gambino family business
frequently became patent.  To wit:

    • On May 30, 2006, Gambino family soldier Ernest
      Grillo told John Doe #4 that he assaulted a
      Gambino family associate who refused to follow
      Grillo's instructions ("I choked him out").

    • On January 19, 2007, Gambino family captain
      Leonard DiMaria was captured instructing another
      member of the Gambino family to use violence to
      collect money demanded ("You have to go bother
      these people for your money. . . they are going to
      tell you we got to sit down and talk and this and
      that.  Rough them up a little.  Tell them, 'You're
      a fucking stiff.'  Tell them what you have to tell
      them. . . . The next guy that owes you money from
      there with them guys, you catch them, and that's
      what I'm saying, that you check in with the other
      guys . . . Crack a face, fuck them up.  Don't you
      do it, send a fucking kid to rough them up.").

    • On January 19, 2008, Gambino family captain
      Nicholas Corozzo, who exercised direct control
      over John Doe #4, harshly reprimanded John Doe #4
      in a raised voice for meeting with another Gambino
      family member without his permission ("Don't you
      go see nobody!").  He then stated that if John Doe

#4 repeated the mistake, he would not merely receive a verbal rebuke ("I'm letting you off easy today.  Don't ever go see nobody.").

Just as Corozzo implied that further disobedience could provoke a violent response - and Grillo and DiMaria explicitly detailed the Gambino family's willingness to use violence to enforce Gambino family demands - the Gambino family extortions in which the defendants took part also carried the implied threat of violence.  A threat obvious not because of the quotes above, but because that implied threat is the point of belonging to an organized crime family - an entity that earns and then uses its reputation for violence to meet its multifarious criminal goals.

John Doe #4 paid the extortion demanded of him because he knew who he was dealing with, and knew that if he did not accede to the Gambino family members' demands he faced retribution from an enterprise long willing to use violent means to enforce its demands.  As such, the two-level enhancement is entirely appropriate.

### 2.   Other Issues

The issues identified below have been raised by the defendants who have submitted sentencing memoranda to date. Should other defendants submit memoranda raising additional arguments, the government will supplement this submission.

#### a.   John D'Amico

Gambino family acting boss John D'Amico claims that his criminal history dating back to the 1960's supports a non-Guidelines sentence because he has sustained no convictions for violent felonies.  The government would point out that becoming the acting boss of the Gambino family is a reward reserved for those who have spent a life dedicated to crime.  He should not be afforded special dispensation for managing to avoid conviction for crimes of violence until now.  Indeed, the very fact that a 72-year-old defendant has pled guilty to a crime of violence attests to his utter inability to reform his conduct and stop participating in the Gambino family's criminal activities.  In other words, if he has not learned by the age of 72, it is inconceivable he will suddenly see the error of his ways and change his life's course.

b.   Ernest Grillo, Mario Cassarino and Frank Cali

Ernest Grillo and Mario Cassarino argue that the PSR incorrectly applies an enhancement for a loss amount of more than $50,000 for the extortion of John Doe #4 relating to the profits from his Staten Island cement plant.  They posit that they should only be held accountable for the extortion payments they personally collected.  Frank Cali makes a similar argument attempting to compartmentalize the charged NASCAR construction site extortion so that the loss amount to under $10,000.  The defendants offer no legal citation in support of their position, and none exists.  Under the plain terms of the applicable enhancement, the relevant loss is the "greater of the amount to the victim of the loss demanded."  See U.S.S.G. § 2B3.2.  Here, there is no dispute that the total loss to the victim totaled more than $50,000 for the Staten Island cement profits extortion and more than $10,000 for the NASCAR construction site extortion. As such, the PSR properly applied the contested enhancement.

II.  The Loansharking Defendants

Defendants James Outerie and Richard Ranieri were charged with RICO conspiracy, including multiple predicate acts and substantive counts of loansharking, loansharking conspiracy and bookmaking.  Defendants Russell Ferrisi and Tara Vega were charged with substantive counts of loansharking and loansharking conspiracy.

Ferrisi and Vega pled guilty to Counts 34 and 55, which charged violations of 18 U.S.C. § 894(a)(1) relating to loanshark victims John Doe #6 and John Doe #8.  Ranieri pled guilty to RICO conspiracy (Count 1), in violation of 18 U.S.C. § 1962(d), and allocuted to Racketeering Acts 36 and 43, which mirror the loansharking conspiracy counts to which Ferrisi and Vega pled guilty.  Outerie pled guilty to a superseding information in case number 08 CR 76 (S-6), charging RICO conspiracy and the same predicate acts to which Ranieri pled guilty, and in a separate case, 06 CR 815 (BMC).

Specifically, Outerie, a Gambino family soldier, and Ferrisi and Ranieri, Gambino family associates, pled guilty to conspiring to collect loanshark payments from John Doe #6 between November 2005 and May 2006.  The defendants met among themselves and with a cooperating witness to discuss the collection of gambling and loanshark payments from John Doe #6 and thereafter contacted the debtor to arrange for the collection of weekly payments.  Ranieri PSR ¶ 147.

Outerie, Ranieri and Vega pled guilty to conspiring to collect loanshark payments from John Doe #8 between March and May 2006.  The defendants discussed among themselves the collection of loanshark payments from John Doe #8.  Vega, who worked with the victim and also had a prior relationship with Outerie, met with the victim and facilitated the repayment.  See Vega PSR ¶ 138.  The victim ultimately repaid the loan to Ranieri.  Ranieri PSR ¶ 148.[3]

III.  The Gambling Defendants

Multiple defendants were charged with conducting two separate illegal gambling operations - one involving bookmaking (Count 29), the other involving joker/poker machines (Count 74) - in violation of 18 U.S.C. § 1955.

A.  Bookmaking

Fifteen defendants pled guilty to the bookmaking charge: Joseph Casiere, Vincent Donnis, Cody Farrell, Ronald Flam, Joseph Gaggi, Anthony Giammarino, Christopher Howard, Steven Iaria, John Kasgorgis, Lance Moskowitz, John Pisano, Giulio Pomponio, Jerry Romano, John Regis and Edward Sobol. Their roles are addressed below.

1.  Steven Iaria

Beginning in September 2005 and continuing up through the time of the indictment, Iaria and others conducted an illegal sports bookmaking operation.  Iaria PSR ¶ 90.  Iaria, along with Gambino family captain Leonard DiMaria, soldier James Outerie and associate Richard Ranieri, managed the day-to-day operations using an offshore gambling service.  Id.  Iaria managed numerous gambling accounts by calling one of the toll-free numbers for the service and identifying himself by various aliases.  Id. ¶ 91. He controlled individual bettor accounts, set wager limits and received account totals.  Id.  Iaria also spoke to and met with Outerie and DiMaria, among others, in conducting the operation. Id.  Outerie also managed numerous gambling accounts by calling the toll-free numbers.  Id. ¶ 90.  Ranieri assisted Outerie in

---

[3]  Outerie and Vega have requested continuances and have not yet filed sentencing submissions.  Ranieri, scheduled to be sentenced on August 6, 2008, has neither sought a continuance nor filed a submission. The government filed a separate submission with respect to Ferrisi, who is scheduled to be sentenced on August 4, 2008.

running the gambling operation by collecting outstanding debts, communicating with "sheetholders" and bettors, and meeting with DiMaria to make payments and discuss the gambling operation.  Id.

The Probation Department assigned Iaria a three-level aggravating role adjustment pursuant to U.S.S.G. § 3B1.1(b) in light of his managerial role in this operation, which involved over 20 participants and spanned over two years.  Id. ¶ 139(a). The defendant stipulated to the same enhancement in the plea agreement.

### 2.   The Sheetholders

Casiere, Donnis, Farrell, Flam, Gaggi, Giammarino, Howard, Kasgorgis, Pisano, Pomponio, Romano, Regis and Sobol were "sheetholders" for the offshore sports gambling operation run by Iaria, Outerie, Ranieri and others.  The sheetholders recruited bettors, collected gambling debts and paid winners.  See, e.g., Casiere PSR ¶ 138.  They generally received a portion of their bettors' losses and were responsible for paying a portion of their bettors' winnings.

### 3.   Lance Moskowitz

Moskowitz was an employee of a music store in Staten Island who served as a drop-off point for Outerie, Ranieri, sheetholders, bettors and others to pick up and drop off money relating to the gambling operation.  Moskowitz PSR ¶ 138. Moskowitz was intercepted on dozens of calls, principally with Outerie, discussing individual sheetholders and the amounts dropped off, as well as drop-offs relating to loansharking debts and other activities as well.  In light of Moskowitz's role, the government and defendant agreed to a two-point aggravating role adjustment pursuant to U.S.S.G. § 3B1.1(c).[4]

### B.   Joker/Poker

### 1.   Frank Vassallo

Vassallo pled guilty to the joker/poker gambling charge.  Vassallo's co-defendant, Vincent Dragonetti, a Gambino family associate, managed a joker/poker gambling operation run out of bodegas, barbershops, private apartments and other

---

[4]   The government disagrees with the Probation Department in this regard, which gives Moskowitz a two-point minor role reduction.  See Moskowitz PSR ¶ 138(a).

locations throughout New York City in late 2006 and early 2007.
Vassallo assisted Dragonetti in managing the operation, dealing
with the owners of the locations where the machines were
installed and arranging for the collection of the proceeds from
the machines.  Vassallo PSR ¶ 119.  He also helped direct the
activities of two mechanics who maintained and repaired the
machines.  Id.  In light of the defendant's role, the government
believes that a two-point aggravating role adjustment pursuant to
U.S.S.G. § 3B1.1(b) is appropriate.

        In his sentencing submission, Vassallo argues that
because he falls within Zone B, he should be sentenced to "a term
of probation that contains no term of incarceration, community
confinement or home confinement."  While the government takes no
position as to where within the Guidelines range the defendant's
sentence should fall, it notes that in the event the Court finds
the defendant to be within Zone B, any term of probation would
also require "a condition or combination of conditions requiring
intermittent confinement, community confinement, or home
detention."  U.S.S.G. § 5B1.1(a)(2).

IV.  Conclusion

        For the foregoing reasons, the defendants should be
sentenced within the respective advisory Guidelines ranges as set
forth in their plea agreements.

                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney


                         By:  _____/s/_____
                              Roger Burlingame
                              Evan Norris
                              Assistant U.S. Attorneys
                              (718) 254-6422/6376

cc:  Defense counsel (by ECF)
     Clerk of Court (JBW) (by ECF)